## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

ARIYAN, INC. D/B/A DISCOUNT CORNER, M.
LANGENSTEIN & SONS, INC., PRYTANIA
LIQUOR STORE, INC., WEST PRYTANIA, INC.
D/B/A PRYTANIA MAIL SERVICE/BARBARA
WEST, BRITISH ANTIQUES, L.L.C./BENNET
POWELL, FINE ARTS MANAGEMENT, L.L.C.
D/B/A PRYTANIA THEATRE, SUPERIOR
SEAFOOD AND OYSTER BAR, L.L.C., THE MAGIC
BOX, LTD. D/B/A MAGIC BOX TOYS, MARK
DEFELICE, SAVARE DEFELICE, JR., ESTEFF
DEFELICE, and VIRGINIA DEFELICE, all on behalf
of the entity f/k/a PASCAL-MANALE RESTAURANT
INC., ARLEN BRUNSON, KRISTINA and BRETT
DUPRE, GAIL MARIE HATCHER, BETTY PRICE,
BOJAN RISTIC, PATSY SEARCY, HELEN GREEN,
THEADA THOMPSON, KIM ALVAREZ and ALLAN
BASIK, JOHN, JR. and JILL BOSSIER, DAVID
ENGLES, ESTATE OF LOUISE STEWART,
CATHLEEN HIGHTOWER, RUTH and LEON
HINSON, MARGARET and HARRY LECHE,
GEORGE MOULEDOUX, ELIZABETH and
WILLIAM SEWELL, PATRICIA WYNN,
GERALDINE BALONEY, ABBRICA CALLAGHAN,
BURNELL COTLON, EIRINN ERNY and
GREGORY KOZLOWSKI, LARRY HAMEEN,
NOELLA HAYES, STEPHEN HOGAN and
FRANSISCA MEDINA-HOGAN, KEEBA and
GAYLIN MCALLISTER, CODY MYERS, HEATHER
WEATHERS, ELIO, CHARLOTTE, and BENITO
BRANCAFORTE, DR. JOSEPHINE S. BROWN,
RICHARD PARKE ELLIS and NANCY ELLIS,
MARK HAMRICK, DR. ROBERT and CHARLOTTE
LINK, ROSS and LAUREL MCDIARMID, JERRY
OSBORNE, JACK STOLIER, DR. WILLIAM B.
TAYLOR, III, WATSON MEMORIAL SPIRITUAL
TEMPLE OF CHRIST D/B/A WATSON MEMORIAL
TEACHING MINISTRIES, GEORGE and BETH
DUESSING, DAVID EPSTEIN, FAYE LIEDER,
THOMAS RYAN, JUDITH JURISICH, DOROTHY
WHITE, THOMAS and JUDITH LOWENBURG,
JOHN and LORI OCHNER, RONALD RUIZ, ANNE
LOWENBURG, SARAH A. LOWMAN, BARBARA H.

CIVIL ACTION NO.:

SECTION

JUDGE:

DIVISION:

MAGISTRATE:

1

WEST, NANETTE COLOMB, MARY and CLAY
KEARNEY, MICHAEL T. GRAY, MARK and ANNA
KURT, THE AMERICAN INSURANCE COMPANY
(AS SUBROGEE OF MARK AND ANNA KURT),
VIRGINIA CARTER STEVENS MOLONY, DAT
DOG ENTERPRISES, LLC, DAT DOG
PROPERTIES, LLC, SUPERIOR BAR & GRILL,
INC., THE FRESH MARKET, INC., K&B
CORPORATION D/B/A RITE AID CORPORATION,
AND 1900 & 1901 COLLIN, L.L.C.

**Plaintiffs,**

v.

SEWERAGE & WATER BOARD OF NEW
ORLEANS, AND GHASSAN KORBAN, IN HIS
CAPACITY AS EXECUTIVE DIRECTOR OF
SEWERAGE & WATER BOARD OF NEW ORLEANS

**Defendants.**

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs: **Ariyan, Inc. D/B/A Discount Corner; M. Langenstein & Sons, Inc.; Prytania Liquor Store, Inc.; West Prytania, Inc. D/B/A Prytania Mail Service/Barbara West; British Antiques, L.L.C./Bennet Powell; Fine Arts Management, L.L.C. D/B/A Prytania Theatre; Superior Seafood and Oyster Bar, L.L.C.; The Magic Box, Ltd. D/B/A Magic Box Toys; Mark Defelice, Savare Defelice, Jr., Esteff Defelice, and Virginia Defelice,** all on behalf of the entity f/k/a **Pascal-Manale Restaurant Inc.; Arlen Brunson; Kristina and Brett Dupre; Gail Marie Hatcher; Betty Price; Bojan Ristic; Patsy Searcy; Helen Green; Theada Thompson; Kim Alvarez and Allan Basik; John, Jr. and Jill Bossier; David Engles; Estate of Louise Stewart; Cathleen Hightower; Ruth and Leon Hinson; Margaret and Harry Leche; George Mouledoux; Elizabeth and William Sewell; Patricia Wynn; Geraldine Baloney; Abbrica Callaghan; Burnell Cotlon; Eirinn Erny**

and Gregory Kozlowski; Larry Hameen; Noella Hayes; Stephen Hogan and Fransisca Medina-Hogan; Keeba and Gaylin McAllister; Cody Myers; Heather Weathers; Elio, Charlotte, and Benito Brancaforte; Dr. Josephine S. Brown; Richard Parke Ellis and Nancy Ellis; Mark Hamrick; Dr. Robert and Charlotte Link; Ross and Laurel McDiarmid; Jerry Osborne; Jack Stolier; Dr. William B. Taylor, III; Watson Memorial Spiritual Temple of Christ D/B/A Watson Memorial Teaching Ministries; George and Beth Duessing; David Epstein; Faye Lieder; Thomas Ryan; Judith Jurisich; Dorothy White; Thomas and Judith Lowenburg; John and Lori Ochsner; Ronald Ruiz; Anne Lowenburg; Sarah A. Lowman; Barbara H. West; Nanette Colomb; Mary and Clay Kearney; Michael T. Gray; Mark and Anna Kurt; The American Insurance Company (as subrogee of Mark and Anna Kurt); Virginia Carter Stevens Molony; Dat Dog Enterprises, LLC; Dat Dog Properties, LLC; Superior Bar & Grill, Inc.; The Fresh Market, Inc.; K&B Corporation D/B/A Rite Aid Corporation; and 1900 & 1901 Collin, L.L.C. (hereinafter referred to as "Plaintiffs"), who allege, as follows:

## PARTIES

1.

Plaintiffs are individuals or businesses all domiciled in Orleans Parish, Louisiana, within the Eastern District of Louisiana, who brought suit for inverse condemnation against the Sewerage & Water Board of New Orleans (hereinafter, "the SWBNO") in various consolidated actions in Orleans Parish (hereinafter, "the SELA litigation").

2.

The SWBNO is a political subdivision of the State of Louisiana, created pursuant to La. R.S. 33:4071, located and operating within this District. The SWBNO is charged with the

3

construction, operation, and maintenance of the water, sewerage, and drainage systems for the City of New Orleans. The SWBNO operates independently of New Orleans city government as a "special board," and it meets the U.S. Government Accountability Office criteria for classification as a "stand-alone governmental entity."  The SWBNO's publicly-proclaimed "Mission, Vision, and Values" statement includes the representation, among other things, that it will provide services "at a reasonable cost to the community" and to "use financial resources prudently."

3.

Ghassan Korban is the Executive Director of the SWBNO, a person of the full age of majority, and a resident of this District.

**JURISDICTION AND VENUE**

4.

This Court has jurisdiction under 28 U.S.C. §1331 and 1343, and 42 U.S.C. § 1983. Declaratory relief is authorized by 28 U.S.C. § 2201 and 2202.

5.

Venue is proper in this District and division under 28 U.S.C. § 1391(b), because the underlying acts and conduct violating applicable laws and constitutional rights occurred in this District, and/or the defendants conduct its/his affairs in, or is an inhabitant of, resides in, or has an agent in this District.

**FACTUAL ALLEGATIONS**

6.

The SELA litigation arose from damage to Plaintiffs' homes and businesses during the construction of the drainage project in Uptown New Orleans known as the South Louisiana Urban Drainage Project or Southeast Louisiana Urban Flood Control Program (hereinafter, "the SELA

Project").

7.

The U.S. Army Corps of Engineers (hereinafter, "the USACOE"), a division of the United States government under the direct jurisdiction of the United States Army, and the SWBNO jointly constructed and managed the SELA Project.

8.

The impetus for the SELA Project was "the periodic flooding that had occurred in the seventies, eighties and nineties." The goal of the Project was to improve drainage and minimize flooding in the Uptown basin of New Orleans and was unrelated to hurricane protection.

9.

The SELA Project involved the construction of massive underground drainage canals to store and transport storm water. The SELA Project has been in operation in various New Orleans locations since the 1990s and has been implemented in phases, as funding, designs, and construction became available and approved. The construction costs for the SELA section at issue in the underlying actions have been reported to exceed $500 million.

10.

The Project Partnership Agreement and Cooperative Endeavor Agreement, executed with the USACOE in 2009, establish the SWBNO's role as the local sponsor of the SELA Project in direct partnership with the USACOE to carry out the design and construction of the Project.

11.

As joint partners, the USACOE and the SWBNO were responsible for 65% and 35% of the SELA Project's costs, respectively. The USACOE advanced the costs entirely with the intention that the SWBNO repay its portion over thirty (30) years. Under an established claims process,

known as "the Damages SOP," the SWBNO was charged with investigating and resolving all SELA-related property damage claims on behalf of the joint partnership.  All resulting settlements were to be directly credited against the SWBNO's indebted share of the SELA Project costs.

12.

Documents distributed by the USACOE and the SWBNO to the public explain the SELA claims process under the Damages SOP, as follows:

1.   Residents initiate the property damage claims process by calling the SELA Hotline.

2.   Once the claim is received, it is forwarded to the attention of the Forensic Engineer who contacts the resident to arrange an inspection of the property.

3.   A report is sent to the SWBNO delineating any and all related damages found to the property during the inspection, along with a detailed estimate of the cost of repairs.

4.   In instances where there is damage, the SWBNO forwards a claim packet to the USACOE on the property detailing the damages for its review and approval.

5.   When the review is complete, assuming that funds expended on a particular claim count toward the SWBNO's 35% contribution, the SWBNO contacts the property owner with a settlement offer.

6.   Once a compromise is reached, upon execution of closing documents, a settlement check is issued.

13.

The USACOE and the SWBNO implemented the SELA Project in various phases in New Orleans over the past decades.  By the time construction began in front of Plaintiffs' properties, the SWBNO already had years of experience with prior phases of the SELA Project and was aware that these projects caused property damages.

14.

The SELA phases encompassing Plaintiffs' homes and businesses in the underlying actions are located in the Uptown and Carrollton Historic Districts of New Orleans on large portions of

South Claiborne Avenue, Jefferson Avenue, Napoleon Avenue, Prytania Street, and Louisiana Avenue.  These SELA phases are formally identified as: Claiborne I, Claiborne II, Jefferson I, Jefferson II, Louisiana, Napoleon II, and Napoleon III.  Plaintiffs' homes and businesses are located within and near these Phases.

15.

The SELA construction on the Claiborne I, Claiborne II, Jefferson I, Jefferson II, Louisiana, Napoleon II, and Napoleon III phases included installing large drainage box culverts in the middle of the streets near Plaintiffs' properties.  This installation involved, among other disruptive activities, constant demolition, excavation, pile driving, jet grouting, and backfill. Furthermore, the oversized construction equipment and numerous construction workers needed to construct the box culverts were constantly present and created the cacophony of noise, house-shaking vibrations, and unrelenting clouds of diesel exhaust, dust, and dirt that invaded Plaintiffs' homes and businesses for years.

16.

The SWBNO and the USACOE both recognized that the SELA Project would damage nearby properties adjacent to the construction sites. Various contracts specify the locations where damage was expected and describe them as:

A.   The Zone of Impact ("ZOI") is where damages to properties were more likely than not to occur, even if the construction work was performed in accordance with the contracts and specifications;

B.   The Area of Potential Effect ("APE") is where "the potential exists for indeterminate damage to properties or structures…as a consequence of construction vibrations;" and

C.   The Construction Impact Zone ("CIZ") is where the potential exists for soil vibration associated with project-related activities.

17.

The Programmatic Agreement ("PA") anticipated damage to Plaintiffs' neighborhoods and included aerial photographs of the properties fronting the SELA Project construction sites outlined in red and precisely pinpointing the homes and businesses that were expected to be damaged by the SELA Project construction.

18.

Damage from the SELA Project construction extended far beyond the projected damages outlined in the PA. These projections were unrealistically conservative, and damage to Plaintiffs' properties located outside of these zones or areas occurred as frequently and as severely as the damage to homes and businesses within the described zones and/or areas.

19.

Despite proceeding in accordance with the SWBNO's plan, the SELA Project construction caused widespread property damages and disturbances to Plaintiffs' homes and businesses, including but not limited to: structural damage (including damaged foundations); shifting porches; broken floors; cracked interior and exterior walls; broken and shifting fireplaces; leaking roofs, plumbing, and sewer lines; cracked sidewalks, patios, and decks; excessive vibrations; noise; dust; and inoperable, leaky doors and windows. These damages were not present prior to construction or were substantially exacerbated after the SELA Project construction.

20.

In addition to widespread physical damages, Plaintiffs were deprived of the use and enjoyment of their properties for years. These impacts included, but were not limited to: noise; dust; dirt; diesel exhaust; chronic traffic congestion; blocked access to properties; demolition activities; sewer and water line replacement; timber pile installation; sheet pile installation; jet grouting; excavation of the temporary retaining structure; construction of the box culvert; backfill;

and paving.

21.

After construction began, the SWBNO was repeatedly notified that the Project was causing damages and disturbances to the nearby property owners.  Plaintiffs made complaints of property damages and disturbances to the SWBNO-managed SELA Hotline multiple times during construction. Additionally, during the SWBNO's public meetings regarding the SELA Project, the SWBNO directly received complaints of property damages and disturbances.  All SELA damage complaints were sent to the SWBNO's Legal Department for investigation and resolution.

22.

As evidence of the SELA Project's consistent, unmitigated damages and disturbances, the SWBNO received copies of vibration monitoring reports that indicated that the SELA construction activities were far exceeding the established vibration thresholds for the SELA Project.  Most importantly, the SWBNO was well aware that these monitoring reports indicated excessive vibrations near Plaintiffs' properties on a regular basis, directly causing the physical damages previously described.

23.

Despite knowing the SELA Project was causing substantial damage to the surrounding area, the SWBNO ignored the complaints and took no action whatsoever to prevent or minimize the damages and disturbances.  Instead, the SWBNO prolonged the process to provide any redress or compensation to Plaintiffs for the SELA-caused damages to their homes and businesses.  On information and belief, the SWBNO conceived, knew of, approved, or tacitly ratified this strategy, while concealing this knowledge and participation from Plaintiffs, other SELA victims, and the public at large.

24.

As joint managers of the Project, the USACOE and the SWBNO hired "forensic engineers" to report the absence of SELA-related damages to homes and businesses, despite substantial evidence that several homes and businesses were damaged by SELA construction.  Using these biased reports, both the USACOE and the SWBNO denied claims entirely, or as the basis to offer pennies on the dollar when compared to the true and actual cost to repair SELA damage.  Furthermore, the SWBNO has failed to provide any evidence that it has submitted credit packages to the USACOE in order to compensate Plaintiffs, while publicly threatening the affected homeowners, including Plaintiffs, for seeking redress with the Court.

25.

As part of the joint agreement between the SWBNO and the USACOE, as a federal entity, all damage settlements paid will be credited toward the SWBNO's share of the project costs outlined in paragraph 11 of this Complaint.  Upon receipt of a claim for damage to real property, the SWBNO is required to notify the USACOE and to investigate the claim to determine whether the claims are eligible for compensation under the Damages SOP.  As the federal government has acted as the creditor for this Project, the SWBNO should promptly compensate its citizens and file the appropriate claim credits with the USACOE, since the settlements paid will reduce its total debt owed to the USACOE and federal government.

26.

According to the SWBNO Strategic Plan, 2011-2020, Mission, Vision, and Values, it has promised the citizens of New Orleans, including Plaintiffs herein, the following:

> Our mission is to provide safe drinking water to everyone in New Orleans; to remove wastewater for safe return to the environment; to drain away storm water; to provide water for fire protection; to provide information about products and services; and to do all this

continuously at a reasonable cost to the community.

Our vision is to have the trust and confidence of our customers for reliable and sustainable water services.  We believe in these values as the foundation for how we will perform our mission and pursue our vision:

….

We will be truthful, trustworthy, and transparent.
We will be knowledgeable and diligent in the performance of our duties.
We will use financial resources prudently.
We will be accountable for our performance.
We will continuously improve our performance.

27.

As alleged above, and as follows, the SWBNO violated the foregoing terms of the Mission Statement in the treatment of Plaintiffs, as alleged herein in this Complaint, by: failing to resolve Plaintiffs' claims at a reasonable cost and within a reasonable period of time; failing to treat Plaintiffs with dignity and respect; failing to be truthful, trustworthy, and transparent in the handling of Plaintiffs and their claims; failing to be knowledgeable and diligent in the treatment of Plaintiffs and their claims; failing to use its financial resources prudently in the handling of Plaintiffs' claims; failing to remain accountable for its treatment of Plaintiffs and their claims; and failing to improve its performance in the handling of Plaintiffs' claims.

28.

In order to determine whether a damage claim should be paid, and qualifies as a settlement credit, the SWBNO must determine:

A.      whether the damages are within the ZOI;

B.      whether the damages are of the type for which credit is to be allowed under the Damages SOP;

C.      whether the damages were caused by the SELA construction;

D.      whether the damages are of the type for which the SWBNO is legally liable; and

E.      whether any circumstances exist which would justify expanding the ZOI to allow for settlement of claims for damages to properties located outside of the ZOI.

29.

Upon concluding the investigation for each property, the SWBNO is required to submit a "credit package" to the USACOE, which will review and approve the settlement, then issue a credit toward the SWBNO's outstanding federal debt.

30.

The SWBNO hired Leonard Quick & Associates ("Quick") to conduct pre-construction and post-construction inspections of properties damaged by the SELA Project.

31.

Written in identical, boilerplate language, the Quick reports regularly and consistently reported "no damage" to any of the examined homes or businesses.  The SWBNO used these generalized reports to obtain nominal settlements to the few claims it settled and, more frequently, to completely deny damage claims. Plaintiffs' claims were denied based on these generalized reports.

32.

In *Holzenthal v. Sewerage & Water Bd. Of New Orleans*,[1] the court found that expert reports Quick issued denying SELA damages were "not credible" and held the SWBNO liable for the claimed damages.  Once again, with regard to Plaintiffs, the SWBNO attempted to deny valid damage claims through superficial and inaccurate damage evaluations.

---

[1] *Holzenthal v. Sewerage & Water Bd. of New Orleans*, 2006-0796 (La. App. 4 Cir. 1/10/07), 950 So. 2d 55, 63, *writ denied*, 2007-0294 (La. 3/30/07), 953 So. 2d 71.

33.

While the claim process was explicitly outlined in the Damages SOP, and the SWBNO had many credible claims to settle and later file with the USACOE, they failed to follow the administrative process to provide just compensation for the affected homeowners.  However, Quick found $130,735.90 in SELA-caused damages at the residence of a local television personality located at 2320 Jefferson Avenue, despite Quick finding no such damage to the homes immediately adjacent to, across the street from, or in the same block.

34.

Consistent with the Damages SOP, the SWBNO promptly submitted a credit package to the USACOE for that residence and recommended the settlement amount estimated in Quick's report.  Additionally, the SWBNO requested that this claim be expedited.  The USACOE's internal correspondence notes that the "Office of Counsel asked that we move this one along as quickly as possible.  This claim is part of the *Sewell* litigation in Uptown New Orleans."  To date, based upon currently available information, that settlement remains the largest SELA claim settled by the SWBNO and an outlier of all of reports issued by Quick that estimated damages.

35.

 Plaintiffs' cases were originally filed in State Court.  Based largely upon the precedent of the *Holzenthal* decision, Plaintiffs named the SWBNO as the sole Defendant, alleging causes of action for inverse condemnation, custodial liability, strict liability, and related theories, specifically noting that "any substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of federal and state constitutions."[2] Inverse condemnation, a regulatory taking:

---

[2] *Holzenthal*, 2006-0796 (La. App. 4 Cir. 1/10/07), 950 So. 2d 55, 63, *writ denied*, 2007-0294 (La. 3/30/07), 953 So. 2d 71.

> [A]rises out of the self-executing nature of the constitutional command to pay just compensation . . . [and] provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a government . . . entity having the powers of eminent domain where no expropriation has commenced. The action for inverse condemnation is **available in all cases where there has been a taking or damaging of property where just compensation has not been paid.**

*Holzenthal*, 2006-0796 (La. App. 4 Cir. 1/10/07), 950 So. 2d 55, 63, *writ denied*, 2007-0294 (La. 3/30/07), 953 So. 2d 71, (citing *State through Dep't of Transp. & Dev. v. Chambers Inv. Co.,* 595 So. 2d 598, 602 (La. 1992)).

36.

The *Ariyan, Inc. d/b/a Discount Corner v. Sewerage & Water Board of New Orleans* matter, CDC No. 15-10789, consisting of Ariyan, Inc. d/b/a Discount Corner, M. Langenstein & Sons, Inc., Prytania Liquor Store, Inc., West Prytania, Inc. d/b/a Prytania Mail Service/Barbara H. West, and British Antiques, LLC/Bennett Powell, resulted in a Judgment dated February 27, 2018 for the sum of two million one hundred and twenty-five thousand dollars and no/100 ($2,125,000.00), plus judicial interest from December 18, 2015, until paid.

37.

The *M. Langenstein & Sons, Inc., et al. v. Sewerage & Water Board of New Orleans* c/w *K & B Louisiana Corporation d/b/a Rite Aid Corporation v. Sewerage & Water Board of New Orleans* matters, CDC No. 15-11971 c/w 15-11394, consisting of Fine Arts Management, LLC d/b/a Prytania Theatre, Superior Seafood & Oyster Bar, LLC, The Magic Box, Ltd. d/b/a Magic Box Toys, and Pascal-Manale Restaurant, Inc.,[3] resulted in a Judgment dated January 2, 2019 for the sum of two million ninety-six thousand three hundred four dollars and 60/100 ($2,096,304.60), plus judicial interest from December 18, 2015, until paid.

---

[3] Mark Defelice, Savare Defelice, Jr., Esteff Defelice, and Virginia Defelice are appearing individually herein on behalf of the entity f/k/a Pascale-Manale Restaurant, Inc.

38.

The *Elizabeth Sewell, et al. v. Sewerage & Water Board of New Orleans* matter, CDC No. 15-4501, Group A case, consisting of George and Beth Duessing, David Epstein, Faye Lieder, Thomas Ryan, Judith Jurisch, and Dorothy White, proceeded to a bench trial on March 12, 2018. On April 25, 2018, the trial court ruled that: the *Sewell* Group A Plaintiffs suffered an inverse condemnation; the SWBNO owned the SELA Project; the Project had either caused new damage to, or exacerbated pre-construction damages within, the *Sewell* Group A Plaintiffs' properties; and caused loss of use and enjoyment of their properties, finding a total of five hundred eighteen thousand six hundred fifty-three dollars and 08/100 ($518,653.08) owed to the *Sewell* Group A Plaintiffs.

39.

On July 17, 2018, the trial court granted the *Sewell* Group A Plaintiffs' Motion for Attorney's Fees and Costs, awarding four hundred thousand dollars ($400,000.00) in fees and one hundred forty-five thousand dollars ($145,000.00) in recoverable costs.

40.

The SWBNO attempted to appeal the *Sewell* Group A ruling; however, on May 29, 2019, the Louisiana Fourth Circuit Court of Appeal affirmed the award, with only a minor amendment of moving and storage damages for the Jurisch/Ryan residence.  The Louisiana Supreme Court denied the SWBNO's writ application on October 16, 2019, rendering the underlying judgments final and executory.

41.

On August 3, 2020, the trial court issued a judgment in favor of the *Sewell*, CDC No. 15-4501, Groups E and F Plaintiffs, consisting of Arlen Brunson, Kristina and Brett Dupre, Gail Marie

Hatcher, Betty Price, Bojan Ristic, Patsy Searcy, Helen Green, Theada Thompson, Kim Alvarez and Allan Basik, John, Jr. and Jill Bossier, David Engles, Estate of Louise Stewart, Cathleen Hightower, Ruth and Leon Hinson, Margaret and Harry Leche, George Mouledoux, Elizabeth and William Sewell, and Patricia Wynn.  The court ruled that: the *Sewell* Group E and F Plaintiffs suffered an inverse condemnation; the SWBNO owned the SELA Project; the SELA Project had either caused new damage to, or exacerbated pre-construction damages within, the *Sewell* Group E and F Plaintiffs' properties; caused other economic losses due to the Project; and caused loss of use and enjoyment of their properties, finding a total of one million three hundred six thousand one hundred twenty-nine dollars and 88/100 ($1,306,129.88) owed to these Plaintiffs.  The trial court also awarded reasonable attorneys' fees and costs to the Groups E and F Plaintiffs in the amount of five hundred forty-eight thousand three hundred ninety dollars and 25/100 ($548,390.25).

42.

The SWBNO has not timely filed an appeal of the *Sewell* Groups E and F Plaintiffs' judgment pursuant to Louisiana Code of Civil Procedure articles 2087 and 2123.  Accordingly, this judgment is final and executory.

43.

On September 29, 2020, the trial court issued a judgment in favor of the *Sewell*, CDC No. 15-4501, Group G Plaintiffs consisting of Geraldine Baloney, Abbrica Callaghan, Burnell Cotlon, Eirrin Erny and Gregory Kozlowski, Larry Hameen, Noella Hayes, Stephen Hogan and Fransisca Medina-Hogan, Keeba and Gaylin McAllister, Cody Myers, and Heather Weathers.  The trial court ruled that: the *Sewell* Group G Plaintiffs suffered an inverse condemnation; the SWBNO owned the SELA Project; the Project had either caused new damage to, or exacerbated pre-construction

damages within, the *Sewell* Group G Plaintiffs' properties; caused other economic losses due to the Project; and caused loss of use and enjoyment of their properties, finding a total of four hundred eighty-seven thousand four hundred fifty-three dollars and 44/100 ($487,453.44) owed to these Plaintiffs.[4]

44.

The SWBNO has not timely filed an appeal of the *Sewell* Group G Plaintiffs' judgment pursuant to Louisiana Code of Civil Procedure articles 2087 and 2123. Accordingly, this judgment is final and executory.

45.

The *Anne Lowenburg, et al. v. Sewerage & Water Board of New Orleans* matter, CDC No. 2016-621, consisting of Elio, Charlotte, and Benito Brancaforte, Dr. Josephine Brown, Richard Parke Ellis, Nancy Ellis, Mark Hamrick, Dr. Robert and Charlotte Link, Ross and Laurel McDiarmid, Jerry Osborne, Jack Stolier, and Dr. William Taylor, c/w *M. Langenstein & Sons, Inc., et al. v. Sewerage & Water Board of New Orleans* c/w *K&B Louisiana Corporation d/b/a Rite Aid Corporation v. Sewerage & Water Board of New Orleans* matters, CDC No. 15-11971 c/w 15-11394 cases, consisting of Watson Memorial Spiritual Temple of Christ d/b/a Watson Memorial Teaching Ministries, proceeded to a bench trial on January 28-30, 2019. On March 21, 2019, the trial court granted the aforementioned Plaintiffs a collective award, totaling nine hundred ninety-eight thousand eight hundred seventy-two dollars and 47/100 ($998,872.47), and it ruled that: Plaintiffs suffered an inverse condemnation; the SWBNO is liable for damages owed to Plaintiffs under the theory of inverse condemnation; the SWBNO owned the SELA Project; the SELA Project had either caused new damage to, or exacerbated pre-existing damages within,

---

[4] The trial court also awarded reasonable attorneys' fees and costs to the Group G Plaintiffs in the amount of $166,963.37.

Plaintiffs' properties; caused loss of use and enjoyment of their properties; and the SWBNO failed

to demonstrate that fault should be allocated to a separate entity, pursuant to the comparative fault

statutes.  Additionally, pursuant to La. Code of Civ. Pro. art 1920, La. R.S. 13:3666, La. R.S.

13:4533, and La. R.S. 13:5111, the Court awarded reasonable attorneys' fees to these Plaintiffs

and taxed the SWBNO with the costs associated with the prosecution of these matters.

46.

On September 12, 2019, the trial court granted the paragraph 45, above, parties' Judgment

for the sum of five hundred seventeen thousand two hundred thirty-one dollars and 03/100

($517,231.03) as the total attorneys' fees and costs due Plaintiffs in Paragraph 45, plus interest at

the Louisiana legal rate from September 12, 2019, until paid.

47.

On July 29, 2020, the Louisiana Fourth Circuit Court of Appeal amended, remanded,

modified and rendered, and affirmed the trial court's Judgment referenced in paragraph 46,

amending the Judgment to include judicial interest from the date of judicial demand, remand for a

hearing on attorney's fees on appeal, and to modify and render the Judgment to read "'Property

Damage $41,838.00' for Appellees Dr. Robert and Charlotte Link" and affirmed as amended.

48.

No writ was taken to the Louisiana Supreme Court, so the paragraph 46 Judgment became

final on August 29, 2020.

49.

The *Anne Lowenburg, et al v. Sewerage & Water Board of New Orleans* matter, CDC No.

2016-621, consisting of Thomas and Judith Lowenburg, John and Lori Ochsner, and Ronald Ruiz,

resulted in a Judgment dated November 19, 2020 for the sum of two hundred eighty-five thousand

twelve and 75/100 ($285,012.75), plus judicial interest from December 18, 2015, until paid.

50.

The *Anne Lowenburg, et al v. Sewerage & Water Board of New Orleans* matter, CDC No. 2016-621, c/w *American Ins. Co. a/s/o Ana Caputto v. U.S. Army Corps of Engineers, et al.* matter, CDC No. 16-3168, consisting of Anne P. Lowenburg, Sarah A. Lowman, Barbara H. West, Nanette Colomb, Mary and Clay Kearney, Michael T. Gray, Mark and Anna Kurt, The American Insurance Company, and Virginia Carter Stevens Molony, resulted in a Judgment dated November 19, 2020 for the sum of seven hundred fourteen thousand five hundred nineteen and 54/100 ($714,519.54), plus judicial interest from December 18, 2015, until paid.

51.

The *M. Langenstein & Sons, Inc., et al. v. Sewerage & Water Board of New Orleans* c/w *K&B Louisiana Corporation d/b/a Rite Aid Corporation v. Sewerage & Water Board of New Orleans* matters, CDC No. 15-11971 c/w 15-11394, consisting of Dat Dog Enterprises, LLC, Dat Dog Properties, LLC, Superior Bar & Grill, Inc., The Fresh Market, Inc., K&B Corporation d/b/a Rite Aid Corporation, and 1900 & 1901 Collin, LLC, resulted in a Judgment dated November 19, 2020 for the sum of nine hundred fifty-six thousand one hundred eleven and 33/100 ($956,111.33), plus judicial interest from December 18, 2015, until paid.

52.

For all of the above-referenced final judgments, the SWBNO owes Plaintiffs approximately $10,530,236.70, plus interest accruing on a daily basis at the legal rate.[5]

---

[5] There are additional damages and attorneys' fees and costs judgments issued by the trial court for the *Sewell* Groups B and D Plaintiffs totaling $2,022,593.85. These judgments are not yet final and executable, but Plaintiffs reserve the right to seek to amend the Complaint to add these Plaintiffs if and when the judgments do become final and executable.

53.

The SWBNO's latest financial statements indicate that it possesses assets exceeding $3 billion and a projected budget surplus.  Furthermore, the SWBNO has the ability to increase rates, issue bonds, and otherwise raise capital to satisfy these outstanding judgments.  Regardless of what the SWBNO may claim, the Damages SOP outlines the process for any settlements paid on behalf of the SELA Project and specifically notes that settlements will count as a credit against the SWBNO's federal debt, on which the SWBNO is already making payments.

54.

On January 11, 2021, counsel for certain Plaintiffs made written demand upon the SWBNO, through Mayor LaToya Cantrell, each and every SWBNO Board Member, and Executive Director Ghassan Korban, for payment of amounts owed to certain Plaintiffs totaling $7,175,820.69 in principal and $1,804,964.66 in interest through December 31, 2020.  The correspondence "demand[ed] payment, appropriation for payment, and a reasonable plan for payment" as well as "the courtesy of a reply within ten (10) days."  No response to the correspondence has been received.

55.

The SWBNO has had a reasonable period of time to pay the above-referenced judgments. Despite amicable demand, the SWBNO has failed to pay any final judgment, appropriate any funds for payment, and/or make a reasonable plan for payment in the near future.  At times, the SWBNO has represented through its lawyers that it had not submitted any of Plaintiffs' claims to the USACOE for credit under the Damages SOP, and at other times said that the SWBNO had submitted the claims of five (5) unidentified Plaintiffs for credit to the USACOE.  Based upon these conflicting statements Plaintiffs are uncertain as to what has actually transpired; however,

the SWBNO has not provided any evidence that it has submitted any of Plaintiffs' claims to the USACOE for credit under the SELA Damages SOP, and there have been no communications with Plaintiffs whatsoever regarding any claims that may have been submitted.  Plaintiffs now have no reason to believe that the SWBNO has any intention of complying with the Court's final judgments.  The SWBNO's clear intention—to avoid payment (or a plan for payment) of Plaintiffs' claims—constitutes a sufficient federal interest in the claims, such that this Court should intervene and enforce the awards.

## COUNT I: VIOLATION OF TAKINGS CLAUSE,
## DUE PROCESS CLAUSE, AND PLAINTIFFS' CIVIL RIGHTS

56.

Plaintiffs repeat, re-allege, and incorporate by reference each of the preceding allegations of this Complaint as though fully set forth at this point.

57.

Defendants are able to sue and be sued in their own names, are "persons" within the meaning of 42 U.S.C. §1983, and were, at all times mentioned herein, acting under State law.

58.

Plaintiffs had their property and property rights forcibly taken from them by the SWBNO without a claim of right by inverse condemnation.  The underlying judgments establish this as a final and unappealable matter of law.  Furthermore, the final judgments set the dollar amount the SWBNO is required to pay in damages.  Plaintiffs possess the right, guaranteed by the Fifth Amendment of the United States, to be actually paid just compensation for the taking of their property by inverse condemnation.[6]

---

[6] *See Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019).

59.

Plaintiffs have made amicable demand for payment, appropriation for payment, and a reasonable plan for payment, without success.  See, e.g., paragraph 54, *supra*.

60.

In addition to the key fact that any amounts paid will be effectively reimbursed by the federal government, the SWBNO's 2020 financial statements demonstrate that the funds are available, yet Defendants have failed to pay any of the court's final judgments.

61.

Defendants' actions and omissions in handling Plaintiffs' SELA Project claims are directly contrary to the SWBNO's Strategic Plan, 2011-2020, Mission, Vision, and Values.

62.

The Takings Clause of the Fifth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment, requires the government to compensate its citizens for any taking of private property for a public purpose "without unreasonable delay."[7]  Plaintiffs fully pursued the state remedy available and received final judgments from the court obligating the SWBNO to compensate the Plaintiffs for violating their Constitutional rights through inverse condemnation.

---

[7] See *Bragg v. Weaver*, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919), quoted in *State, Dept. of Highways v. Olinkraft, Inc.*, 333 So.2d 721 (La. App., 1976), aff'd 350 So.2d 865 (La. 1977).  While neither the federal constitution nor any court have said precisely how long is too long to wait to pay just compensation, one court explained, "Just compensation in my opinion means exactly what it says, and it means that the owner himself is entitled to receive his compensation; not that his estate or his children or his grandchildren are to receive installment payments and perhaps inherit a law suit in the far future."  *United States v. 9.94 Acres of Land in City of Charleston*, 51 F.Supp. 478, 483-84 (E.D.S.C.1943); quoted in *Wileman v. Wade*, 665 S.W.2d 519, 520 (Tex. App.-Dallas 1983).  See also, *McGibson v. County Court*, 95 W.Va. 338, 121 S.E. 99 (1924) (finding that where land is taken by condemnation "there must be…some remedy to the owner whereby he may have compensation within a reasonable time…he must not be put to risk or unreasonable delay.").

63.

Defendants' refusal to honor their obligations to make payment of just compensation, pursuant to the final judgments rendered by the Louisiana state courts after demand and reasonable opportunity, constitutes a knowing, willful, and ongoing violation of Plaintiffs' constitutional rights under 42 U.S.C. §1983, which is now ripe for adjudication.  As the United States Supreme Court found in *Knick v. Twp of Scott, Pennsylvania*:

> The availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim—just as the existence of a state action for battery does not bar a Fourth Amendment claim of excessive force. The fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right. And that is key because it is the existence of the Fifth Amendment right that allows the owner to proceed directly to federal court under § 1983.

*Knick*, 139 S. Ct. 2162, 2171, 204 L. Ed. 2d 558 (2019).

64.

Further, and without reasonable basis therefore, Plaintiffs' due process rights have been violated, because Defendants have treated them differently than non-litigants merely because Plaintiffs have exercised their constitutional right to file suit to protect their rights and property interests.  This constitutes a violation of the Due Process Clause of the Fourteenth Amendment, which prohibits any State governmental agency, such as Defendants, from depriving any person of life, liberty, or property without due process of law.

65.

The Supreme Court of the United States has recognized that state and federal claims may arise simultaneously when a Constitutional right is violated, and it expressly stated:

> Our holding that uncompensated takings violate the Fifth Amendment will not expose governments to new liability; it will simply allow into federal court takings

claims that otherwise would have been brought as inverse condemnation suits in state court.

*Knick*, 139 S. Ct. 2162, 2179, 204 L. Ed. 2d 558 (2019).

66.

Unlike *Knick*, Plaintiffs did pursue inverse condemnation claims in state court and received final judgments, thus completing the procedure for the available state remedy. The SWBNO's failure to comply with its agreement with the USACOE to investigate and resolve SELA damage claims under the Damages SOP is a clear violation of the Constitutional guarantees of the Fifth Amendment and the Takings Clause. However, the outright refusal to comply with a final judgment and continue to withhold just compensation creates a secondary Constitutional violation of Plaintiffs' Fifth Amendment rights. Defendants' actions, and lack thereof, have continued to damage Plaintiffs and implicate substantial federal interests and funds. These federal interests are sufficient as a matter of law to overcome Louisiana's anti-seizure laws and enable this Court to enforce the underlying judgments against the SWBNO.

67.

The relevant federal interests at issue include: the USACOE's role as a federal agency; the federal financing, administration, and oversight of the SELA Project, and its funding, administering, and overseeing construction of the SELA Project; the USACOE's financial role, as a federal entity, as a creditor with a substantial interest in the debts incurred by the SWBNO during the SELA Project; the United States legislature's approval and appropriation of the funds for the Project; and, finally, but not exhaustively, the USACOE's managerial and administrative role in the review and approval of property damage claims submitted by the SWBNO.

68.

These federal interests and the precedent set by the Supreme Court of the United States

permit this Court to protect the Constitutional rights of Plaintiffs by ordering Defendants to fulfill their obligation under the state of Louisiana and the Constitution to compensate Plaintiffs for their damages.

## COUNT II: DECLARATORY RELIEF

69.

Plaintiffs repeat and reallege all foregoing allegations as though fully set forth at this point.

70.

As evidenced by sworn testimony of a SWBNO representative, the Damages SOP, specifically created in anticipation of SELA damages, is for the direct benefit of the owners and/or residents of properties damaged by the SELA Construction that are located at, near, or within the ZOI, APE, and/or CIZ. The purpose of the Damages SOP is to identify properties subject to damage as a result of the SELA Project and to investigate and resolve SELA-caused property damage to them. This document outlined the procedure to file damage claims, the SWBNO's role as investigator, and the USACOE's ultimate decision to grant a settlement. Furthermore, this agreement outlines how the financial obligations between the SWBNO and the USACOE are directly affected by homeowners' and businessowners' damage claims. This procedure was created with the complete expectation that third parties would be directly impacted by the SELA Project and explicitly anticipates the process to be for the benefit of those third parties.

71.

Both the USACOE and the SWBNO specifically anticipated and acknowledged that damages to Plaintiffs' properties as a result of SELA construction were likely to occur.

72.

Plaintiffs are third-party beneficiaries to the Damages SOP and agreed-upon procedure

with the USACOE, and, as a result, Defendants have violated Plaintiffs' constitutional rights, as stated above, and in addition breached their contractual obligations to both the USACOE and Plaintiffs by violating the terms of the Damages SOP.  The SWBNO failed to objectively and truthfully investigate damages to Plaintiffs' homes and businesses, failed to provide evidence of any submissions to the USACOE of credit packages representing the amounts awarded to Plaintiffs in the underlying judgments, and has failed to resolve Plaintiffs' claims in accordance with the procedure outlined in the Damages SOP and followed by Plaintiffs to final judgment.

73.

An actual controversy between Defendants and Plaintiffs arose at the time of the taking, and then again at the SWBNO's continuous refusal to comply with the Damages SOP.  The SWBNO is obligated, by their agreement with the USACOE in the Damages SOP, to: investigate and resolve Plaintiffs' claims; submit credit packages to the USACOE representing the amounts awarded to Plaintiffs in the underlying judgments; and pay the sums awarded in underlying judgments, pursuant to the terms of the Damages SOP.  Defendants, in violation of state and federal law, apparently deny that any such obligations exist.

74.

Per the Constitutionally-protected rights enumerated in the Takings Clause, Plaintiffs should receive an explicit judicial determination of the respective rights and duties of Defendants regarding these constitutional and contractual violations.

75.

Such judicial declarations are necessary and appropriate at this time, as an actual and justiciable controversy exists between Plaintiffs and Defendants regarding the violation of their Fifth Amendment rights and Defendants' obligations under the Damages SOP.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment in their favor and against the Defendants, as follows:

1. For a judicial declaration that:

   a. Defendants' conduct has deprived Plaintiffs of their rights, privileges, and immunities secured by the Constitution of the United States;

   b. Defendants are obligated, per the Damages SOP, to investigate and resolve Plaintiffs' claims;

   c. Defendants are required to submit credit packages to the USACOE representing the amounts awarded to Plaintiffs in the underlying judgments in order to reduce the total debt owed to the federal government; and

   d. Defendants are obligated to pay to Plaintiffs within a reasonable time, pursuant to the terms of the Damages SOP and the United States Constitution, the full sums awarded to them in the underlying judgments;

2. For a judgment and issuance of a writ of execution under FRCP Rules 69 and 70, authorizing seizure by appropriate authorities of the SWBNO's property, wherever located, in amounts sufficient to satisfy the underlying judgments;

3. For judicial interest pursuant to the Judgments until paid;

4. For attorney's fees in accordance with 42 USC §1988;

5. For costs of suit herein; and

6. For such other and further relief as this Honorable Court may deem just and proper.

Respectfully submitted,
**SMITH & FAWER, LLC**
**BY: /s/   Randall A. Smith**
**Randall A. Smith (#2117)**
**Mary Nell Bennett (#32339)**
**Sarah A. Lowman (#18311)**
**Smith & Fawer, LLC**
201 St. Charles Ave., Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
rasmith@smithfawer.com
mnbennett@smithfawer.com
salowman@smithfawer.com

Counsel for Plaintiffs, Ariyan, Inc. d/b/a Discount Corner, M. Langenstein & Sons, Inc., Prytania Liquor Store, Inc., West Prytania, Inc. d/b/a Prytania Mail Service/Barbara West, British Antiques, L.L.C./Bennet Powell, Fine Arts Management, L.L.C. D/B/A Prytania Theatre, Superior Seafood and Oyster Bar, L.L.C., The Magic Box, Ltd. d/b/a Magic Box Toys, Mark Defelice, Savare Defelice, Jr., Esteff Defelice, and Virginia Defelice, all on behalf of the entity f/k/a Pascal-Manale Restaurant Inc., Elio, Charlotte, and Benito Brancaforte, Dr. Josephine S. Brown, Richard Parke Ellis, Nancy Ellis, Mark Hamrick, Dr. Robert and Charlotte Link, Ross and Laurel McDiarmid, Jerry Osborne, Jack Stolier, Dr. William B. Taylor, III, Watson Memorial Spiritual Temple of Christ d/b/a Watson Memorial Teaching Ministries, Thomas and Judith Lowenburg, John and Lori Ochsner, Ronald Ruiz, Anne Lowenburg, Sarah A. Lowman, Barbara H. West, Nanette Colomb, Mary and Clay Kearney, Michael T. Gray, Mark and Anna Kurt, The American Insurance Company (as subrogee of Mark and Anna Kurt), Virginia Carter Stevens Molony, Dat Dog Enterprises, LLC, Dat Dog Properties, LLC, Superior Bar & Grill, Inc., The Fresh Market, Inc., K&B Corporation d/b/a Rite Aid Corporation, And 1900 & 1901 Collin, L.L.C.

**BRUNO & BRUNO**
**BY: /s/   Joseph M. Bruno**
**Joseph. M. Bruno (La. Bar # 3604)**
**Daniel A. Meyer (La. Bar # 33278)**
**Bruno & Bruno**
855 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-1335

-AND-

**Michael T. Whitaker (Cal. Bar # 118403)**
**Alexis A. Butler (La. Bar #32376)**
**The Whitaker Law Firm, APC**
201 St. Charles Avenue, Suite 2500
New Orleans, Louisiana 70170
Telephone: (504) 313-0168
lexybutler@whitakerlaw.net

Counsel for Plaintiffs, George and Beth Duessing, David Epstein, Faye Lieder, Thomas Ryan, Judith Jurisich, Dorothy White, Arlen Brunson, Kristina and Brett Dupre, Gail Marie Hatcher, Betty Price, Bojan Ristic, Patsy Searcy, Helen Green, Theada Thompson, Kim Alvarez and Allan Basik, John, Jr. and Jill Bossier, David Engles, Estate of Louise Stewart, Cathleen Hightower, Ruth and Leon Hinson, Margaret and Harry Leche, George Mouledoux, Elizabeth and William Sewell, Patricia Wynn, Geraldine Baloney, Abbrica Callaghan, Burnell Cotlon, Eirinn Erny and Gregory Kozlowski, Larry Hameen, Noella Hayes, Stephen Hogan and Fransisca Medina Hogan, Keeba and Gaylin McAllister, Cody Myers, and Heather Weathers