**Civil District Court for the Parish of Orleans**
**STATE OF LOUISIANA**

No.   2015 - 04501                                                    Section:   12 - D

SEWELL, ELIZABETH  ET AL
versus
SEWERAGE AND WATER BOARD OF NEW ORLEANS

Date Case Filed:   5/11/2015

NOTICE OF SIGNING OF JUDGMENT

TO:

Joseph M Bruno Esq          03604
855 Baronne St
New Orleans          LA 70113-1102

Daniel A Meyer Esq          33278
855 Baronne Street, Third Floor      X MAIL
New Orleans          LA 70113

Joseph B Morton Esq          19072
201 St. Charles Avenue
Suite 2411                              X MAIL
New Orleans          LA 70170

Craig B Mitchell Esq          24565
615 Baronne Street, Suite 300
New Orleans          LA 70113          X MAIL

Christopher D Wilson Esq          27142
615 Baronne St
Ste 300
New Orleans          LA 70113

Alexis A Butler Esq          32376
201 St. Charles Ave.
2500
New Orleans          LA 70118          X MAIL

In accordance with Article 1913 C.C.P., you are hereby notified that Judgment
in the above entitled and numbered cause was signed on    April 25, 2018
New Orleans, Louisiana.
April 25, 2018

MINUTE CLERK

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

**CASE NO: 15-4501**              **DIVISION: D**              **SECTION: 12**

**ELIZABETH SEWELL, ET AL.**

**VERSUS**

**SEWERAGE & WATER BOARD OF NEW ORLEANS**

FILED: _____        _____

                                                    **DEPUTY CLERK**

**RESIDENTIAL TRIAL GROUP A**
**JUDGMENT**

This matter came before the Court for trial on the 12th day of March, 2018.

Present:        Joseph M. Bruno (La. Bar # 3604)
                    Daniel A. Meyer (La. Bar # 33278)
                    Alexis A. Butler (La. Bar # 32376)
                    Michael T. Whitaker (*Pro Hac Vice*)
                    Counsel for *Sewell* Plaintiffs

                    Craig B. Mitchell (La. Bar # 24565)
                    Chris D. Wilson (La. Bar # 27142)
                    Joseph B. Morton, III (La. Bar #19072)
                    Counsel for Sewerage and Water Board of New Orleans

This Judgment concerns the following group of plaintiffs known as Residential Trial Group A:

Plaintiffs:        George and Beth Deussing – 5626 Prytania St.
                    David Epstein – 5617 Prytania St.
                    Faye Lieder – 731 Napoleon Ave.
                    Thomas Ryan and Judith Jurisich – 1106 Napoleon Ave.
                    Dorothy White – 8833 South Claiborne Ave.

In consideration of the law and the evidence, the Court hereby renders the following:

**IT IS ORDERED, ADJUDGED AND DECREED** that plaintiffs suffered an inverse condemnation.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** the Sewerage and Water Board of New Orleans ("SWB") is liable for damages owed to plaintiffs under the theory of inverse condemnation.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that SWB is the owner of the SELA Project.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED the SELA Project construction activities caused new damage to, or exacerbated pre-existing damage within, the plaintiffs' properties. The SELA Project caused plaintiffs to suffer a loss of use and enjoyment of their properties.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that SWB is strictly liable under La. C.C. art. 667 for ultrahazardous pile driving that occurred at the White residence, 8831-8833 South Claiborne Ave., during Claiborne Phase I. The Court does not find that ultrahazardous activity occurred at any other property.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that SWB is strictly liable under La. C.C. arts. 2317 and 2317.1.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that SWB failed to demonstrate that fault should be allocated to a separate entity pursuant to the comparative fault statutes.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED the Court finds that the SELA Project did not cause damage to the foundations of the plaintiffs' homes such that they need replacing or reinforcing.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED the Court does not find that plaintiffs are entitled to relocation damages or damages to cover the cost moving and storing the contents of their homes during repairs.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that SWB owes damages to plaintiffs in the following amounts:

1. **George and Beth Deussing – 5626 Prytania St.**

| | |
|---|---|
| Property Damage: | $46,660.95 |
| Loss of Use and Loss of Enjoyment: | $19,225.00 |
| Total: | $65,885.95 |

2. **David Epstein – 5617 Prytania St.**

| | |
|---|---|
| Property Damage: | $56,088.05 |
| Loss of Use and Loss of Enjoyment: | $23,887.50 |
| Total: | $79,975.55 |

3.   **Faye Lieder – 731 Napoleon Ave.**

   Property Damage:                              $126,048.71
   Loss of Use and Loss of Enjoyment:           $38,016.00
   Total:                                        $164,064.71

4.   **Thomas Ryan and Judith Jurisich – 1106 Napoleon Ave.**

   Property Damage:                              $91,094.55
   Loss of Use and Loss of Enjoyment:           $23,751.75
   Total:                                        $114,846.30

5.   **Dorothy White – 8831-8833 S. Claiborne Ave.**

   Property Damage:                              $65,726.57
   Loss of Use and Loss of Enjoyment:           $28,154.00
   Total:                                        $93,880.57

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that pursuant to the above calculations, plaintiffs in Residential Trial Group A are hereby awarded a money judgment against SWB in the amount of FIVE HUNDRED EIGHTEEN THOUSAND, SIX HUNDRED FIFTY-THREE DOLLARS AND EIGHT CENTS ($518,653.08).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that pursuant to La. C.C.P. art. 1920, La. R.S. § 13:3666, La. R.S. § 13:4533, and La. R.S. § 13:5111, the Court awards reasonable attorney fees to plaintiffs, and SWB is taxed with the costs associated with the prosecution of this matter, all to be determined pursuant to a rule to show cause.

**RENDERED, READ AND SIGNED** this 25th day of April, 2018, in New Orleans, Louisiana.

_____
**HONORABLE NAKISHA ERVIN-KNOTT**
**JUDGE, CIVIL DISTRICT COURT**

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Judgment

Page 3 of 3

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

**CASE NO: 15-4501**           **DIVISION: D**           **SECTION: 12**

ELIZABETH SEWELL, ET AL.

VERSUS

SEWERAGE & WATER BOARD OF NEW ORLEANS

FILED: _____          _____
                                        **DEPUTY CLERK**

<u>**REASONS FOR JUDGMENT**</u>

## I.   FACTS AND EVIDENCE

### A.   Background

Homeowners filed suit against the Sewerage and Water Board of New Orleans ("SWB") asserting property and other related damages allegedly caused by the installation of drainage canals in the Uptown and Carrolton neighborhoods of New Orleans.

The installation of the canals form part of the Southeast Louisiana Urban Drainage Program ("SELA"), which consists of several federally sponsored projects aimed at improving the local drainage system. The project at issue consists of seven phases: Claiborne I, Claiborne II, Jefferson I, Jefferson II, Napoleon II, Napoleon III, and Louisiana I (the "SELA Project"). Approximately three hundred homeowners have joined the *Sewell* lawsuit. The plaintiffs in the instant matter, referenced as Residential Trial Group A, include five sets of homeowners above the age of seventy: George and Beth Deussing, David Epstein, Faye Lieder, Thomas Ryan and Judith Jurisich, and Dorothy White (hereinafter the "plaintiffs").

Plaintiffs seek to hold SWB liable for damages pursuant to multiple theories of recovery including inverse condemnation, strict liability, and negligence. SWB has denied any and all liability. SWB asserts defenses of comparative fault, denial of negligence and strict liability, and that inverse condemnation is inapplicable. In the event the Court finds SWB liable, SWB asserts plaintiffs' recovery should be limited to just compensation under the Fifth Amendment to the United States Constitution.

SWB has maintained that the project was constructed under the administration of the project's federal sponsor, the United States Army Corps of Engineers ("USACE"), and that USACE and the contractors who performed construction work on the project should be held liable. SWB filed multiple third-party claims against the contractors selected by USACE for the SELA Project. The third-party contractors effectively removed these claims to the United States District Court for the Eastern District of Louisiana. There, the presiding judge dismissed SWB's third-party claims upholding the contractors' defense of government contractor immunity.

           1.    <u>Contractual Agreements Establishing the SELA Project</u>

In 1997, the Army (referred to in the contracts as the "Government") and SWB entered into a Project Cooperation Agreement ("PCA") for the construction of certain work to improve the interior drainage system and reduce flood-related damage in Orleans Parish.

On January 16, 2009, the Army and the Coastal Protection and Restoration Authority of Louisiana ("CPRA") entered into an agreement called the Project Partnership Agreement ("PPA"). The PPA defines CPRA as the "non-federal sponsor" and identifies the multiple phases of the SELA Project. The PPA outlines the "65/35" cost share arrangement between the Army and the non-federal sponsor. The agreement authorizes the Army to allocate money to fund 65% of the cost of the project and states the non-federal sponsor would share 35% of the cost. Additionally, the PPA provides that the non-federal sponsor would enter into a Cooperative Endeavor Agreement with SWB for the performance of the non-federal sponsor's obligations under the PPA.

Also on January 16, 2009, SWB and CPRA entered into the Cooperate Endeavor Agreement ("CEA"). This agreement would form the basis upon which SWB operated in conjunction with the State of Louisiana and the USACE for the performance of all SELA projects.

The CEA provides in parts:

> WHEREAS, JP [Jefferson Parish] and SWBNO [SWB] have been solely responsible, as between JP and SWBNO and the Government for any responsibilities and/or obligations undertaken under the PCAs, including the providing of funding, land, easements, and right of way acquisition, and various types of in-kind work for the Project;
>
> . . . .

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A          Page 2 of 34

WHEREAS, CPRA and JP and SWBNO are entering into this Agreement for the purpose of having CPRA sign the SELA PPA as the Non-Federal Sponsor, as required by the Government, but to continue to recognize JP's and SWBNO's jurisdiction and primary participation **as the non-federal local entities that will be directly partnering with the Government in carrying out the design and construction of the Project and as the entities that will undertake and be responsible for the operation, maintenance, repair, replacement, and rehabilitation of their respective portions of the Project once it or functional portions thereof are completed;**

WHEREAS, **CPRA will in fact delegate in whole or in part its responsibilities of the Non-Federal Sponsor under the SELA PPA to JP and SWBNO,** which responsibilities fall within the respective constitutional and statutory purposes, duties, and authorities of JP and SWBNO, and JP and SWBNO desire to accept and perform their respective purposes, duties, authorities, and responsibilities; and

WHEREAS, CPRA, and JP and SWBNO intend for this Agreement to provide for the respective obligations and responsibilities of each party in relationship to each other and in relationship to the Government relative to the obligations and responsibilities assumed under the SELA PPA to be signed between CPRA and the Government . . .

. . . .

IV.     Hold Harmless and Indemnify

. . . .

B.     As to those portions of the Project under its authority and jurisdiction and care, custody, and control, SWBNO agrees and obligates itself and its successors and assigns to defend, indemnify, save, protect, and hold harmless CPRA and its successors, officers and employees against any and all claims, demands, suits, actions, judgments, attorney's fees, or costs arising or allegedly arising out of its responsibilities enumerated and undertaken herein, or any violation of Louisiana or Federal law or regulations, or any negligent act, omission, operation, or work by SWBNO or its employees, agents, representatives, or contractors, except for damages due to the fault or negligence of CPRA, its employees, or its contractors.

C.     To the extent required by CPRA as the Non-Federal Sponsor under the SELA PPA, JP and/or SWBNO shall hold and save the Government free from all damages arising from design, construction, operation, maintenance, repair, rehabilitation, and replacement of the Project, except for damages due to the fault or negligence of the Government or its contractors.

(Emphasis added).     These agreements show that CPRA executed the PPA as the non-federal

sponsor for and on behalf of SWB so SWB could assume all of CPRA's contractual

responsibilities and obligations in order to execute the SELA Project.  Moreover, the agreements

show that SWB would indemnify CPRA and the Government from damages arising out of the construction of the project, excluding damages due to negligence of the CPRA, and the Government or its contractors.

### 2.    The SELA Project: USACE and SWB Roles and Responsibilities

SWB and USACE shared a number of responsibilities with regard to the design and execution of the SELA Project. Deposition transcripts and testimony from representatives of USACE and SWB were admitted into evidence.

SWB was responsible for the conceptual designs of the different phases of the SELA Project. John Fogarty Deposition 42, Aug. 10, 2016. SWB retained consultants, known as designers of record, who developed all of the plans for the project. *Id.* SWB maintained a Network and Drainage Engineering Department that acted as the department lead for SELA. Melvin Spooner Deposition 58, Nov. 7, 2017. The consultants who designed the SELA projects reported to the department head of the Network and Drainage Engineering Department. *Id.* at 58-59. SWB had the ability to make recommendations to the design consultants. *Id.* at 62. During the preliminary design stages, USACE goes through a review process of the plans and specifications and provides comments back to SWB's designers of record. Fogarty Dep. 42-43, Aug. 11, 2016.

SWB employed a SELA Project manager who was responsible for the oversight of the engineering firms and was there to resolve or take appropriate measures. *Id.* SWB coordinated with USACE on the actual construction of the project and reviewed the progress of the project. Fogarty Dep. 1317, Aug. 15, 2016. USACE performed daily inspections to ensure that contractors built the box culverts in accordance with the plans and specs. *Id.* at 66. At times, SWB and USACE performed walk-throughs together. *Id.* SWB had review and acceptance authority over aspects of the SELA Project construction. Spooner Dep. 59.

In certain instances, SWB performed construction work. Fogarty Dep. 254, Aug. 10, 2016. SWB performed an emergency valve repair, sewer main replacement, and parking lane repair. *Id.* at 254-255. SWB provided access to the lands, easements, and rights-of-way to build the drainage system. Spooner Dep. 88. SWB tied in the SELA drainage system with the existing

drainage system. *Id.* at 89.    At times, SWB coordinated with the contractors to relocate or install new water mains. Fogarty Dep. 722, Aug. 12, 2016.

SWB did not select contractors for the work. *Id.* at 259.  USACE was responsible for the award and the administration of the construction contracts. *Id.*  SWB could not directly instruct the contractors to do something but had to go through USACE because USACE had the contract with the contractors. *Id.* at 261.  USACE required contractors to submit a Quality Control Plan. *Id.* at 960.  SWB was not involved in drafting the contractor's quality control plans. *Id.* at. 958.

SWB hired a forensic contractor, Leonard Quick of Quick and Associates, to perform pre-construction inspections of the properties and to install piezometers and inclinometers.[1] Fogarty Dep. 168, Aug. 10, 2016; Spooner Dep. 56.  SWB maintained a SELA Project Hotline whereby complaints were logged with the SWB.  Fogarty Dep. 270, Aug. 10, 2016.  SWB received the complaints through their consulting firm and then passed along the complaints to the project manager for USACE who would act on the complaints. *Id.*  Additionally, USACE maintained its own separate hotline. *Id.* at 272.

### 3.  Anticipated Consequences of the SELA Project: Vibrations and Adverse Effects

Prior to the start of construction, SWB and USACE were aware that vibrations were a concern.  Spooner Dep. 52; Fogarty Dep. 1125-1126, Aug. 15, 2016.  USACE anticipated there would be vibrations due to pile driving, the operating of heavy equipment, excavations, and other construction activity. Fogarty Dep. 108, Aug. 10, 2016.

A SELA Brochure, made available on the SELA website and to patrons at SWB's public meetings, acknowledges the potential for impacts to the surrounding areas due to SELA Project construction. Pls.' Ex. P-19.  The Brochure explains that noise and vibrations from moving and operating heavy construction equipment could have an impact on structures located within close proximity to the Zone of Impact ("ZOI").[2] *Id.*  The Brochure explains that scientific research has established the most significant factor to best indicate the potential for damage is peak particle

---

[1] A piezometer measures groundwater.  An inclinometer measures incline.

[2] "The construction ZOI is defined as the area in which it is more likely than not that damages will occur. Based on scientific data obtained to date, the ZOI's outer boundary is at the line formed upon the surface at a forty-five (45) degree angle from the bottom tip depth of driven sheet pile." Pls.' Ex. P-19.

velocity ("PPV"), which is measured in inches per second ("ips"). Id. The Brochure states that a limit of 0.25 ips PPV is "very conservative." Id.

In April of 2010, SWB signed a Programmatic Agreement ("PA"). The PA recognized that SELA Project construction posed a risk of adverse effects to properties located in the Uptown and Carrolton neighborhoods. Pls.' Ex. P-5. The PA mapped out structures within the Area of Potential Effects ("APE") that were susceptible to indeterminate damage as a consequence of construction vibrations. Id. Additionally, the PA mapped out areas within the Construction Impact Zone ("CIZ") where the potential existed for soil vibration associated with project-related activities. Id. The PA provided that USACE would require contractors to perform work within a manner limiting vibrations at the structure nearest to the site of construction activity to a maximum of 0.25 inches per second. Id.

During construction, vibration monitoring was accomplished by a monitor hired by the USACE. Fogarty Dep. 110, Aug. 10, 2016. The contracts required contractor's operations to remain under the .25 inches per second particle velocity as detected by vibration monitoring. Id. at 110. If a vibration exceeded .25 ips PPV, the vibration monitor was instructed to report it to the USACE inspector, and the USACE inspector was to report it to the contractor. Id. at 116.

As illustrated by the deposition testimony, the PA, and the SELA Brochure, SWB and USACE anticipated adverse consequences due to construction related vibrations.

### B.    Fact Witnesses

#### 1.    Plaintiff: George Deussing

Dr. George Deussing is a seventy-one year old retired pediatric dentist who resides at and owns the property located at 5626 Prytania St. with his wife Beth Deussing. Dr. Deussing and his wife purchased the property in 2012. As he was retiring, Dr. Deussing testified that he and his wife wanted to relocate to New Orleans to be closer to their two daughters.

After the purchase, the couple hired a home construction company, Guillot Building, to perform a complete renovation. The couple spent just under $560,000.00 on the renovation. The only thing that was not renovated, according to Dr. Deussing, was the electrical system. Dr. Deussing stated he was satisfied with the renovation and there were no defects in the home.

Dr. Deussing testified that the construction activities caused cracks to appear that were

not present at the conclusion of the renovation. He testified that the crown molding began separating from the base boards and cracks appeared in the crown molding, among other damages.

Both roads bordering his property, Prytania St. and Arabella St., were torn up for construction activities. He testified there was no room for a personal vehicle. He stated they lived at "ground-zero" and there was always pounding of some nature occurring outside of the home. He complained that he constantly heard a generator, and he and Mrs. Deussing sometimes had to take sleep medication in order to fall asleep. He described hearing a "clacking" sound on regular basis and often times smelled diesel fumes emitting from the construction equipment. Dr. Deussing declared he and his wife spent three years next to a "demo derby" and the project was beyond an annoyance. He testified that when they moved to the neighborhood they looked forward to being social with the new neighbors; however, after construction began, they did not want to socialize. Dr. Deussing testified they now wish to sell their Prytania St. home.

2.   Plaintiff: David Epstein

David Epstein is seventy-five years old and owns and lives at the property located at 5617 Prytania St. When he purchased the property in 1978, it was a double. He later converted the property into a single family unit. He stated he has never performed foundation work on the home. In 2011, he performed a renovation where he put in a new kitchen, stripped the floors, and replaced the molding. Prior to the SELA construction, Mr. Epstein testified his home was in "pristine" condition. He admitted that there were cracks in the mortar but not in the bricks of the foundation. Other than hairline cracks, Mr. Epstein testified no major work needed to be done.

According to Mr. Epstein, the construction began in February of 2014, when workers began to operate jackhammers outside his home. Mr. Epstein testified that the construction activities caused cracks to form along the sheet rock, along the baseboards and in the molding. He claimed the construction work caused his kitchen cabinets to fall off of the wall.

Mr. Epstein testified his porch sat eighteen feet from the construction site. He constantly felt vibrations. He testified that workers were active every day from early morning until 4:00 P.M. He complained that at times he could not work from home, as a day trader, because the noise was too loud. The SELA Project caused Mr. Epstein to stop entertaining guest as much as

he preferred. He was unable to get to his property by car and could not access his driveway during construction. He further testified that SWB held public meetings but they became a joke because nothing SWB said ever came true. Mr. Epstein testified that the SELA Project was the second worst thing to happen to him next to losing his son.

3. Plaintiff: Faye Lieder

Faye Lieder is seventy-six years old and lives and owns the three-story home located at 731 Napoleon Ave. Ms. Lieder testified when she acquired the property, in 1973, it was in terrible condition. She testified she spent $300,000.00 on renovations. Prior to construction, she testified that there were "hairline" cracks in some rooms, but there was zero damage to the plaster work. She claimed that the construction work caused cracks to open up and the natural plaster started to fall. Even though she recently refurbished the front porch and porch columns, she contended that the construction work caused the porch steps to separate from the buttresses and the porch to separate from the home. Ms. Lieder further stated that cracks formed around her three fireplaces.

Ms. Lieder complained that construction caused "constant dust everywhere." She testified to hearing constant noise. She complained no one could come over to visit. She recalled that trucks and backhoes were outside her home all day and blocked access to her driveway.

In June of 2016, Ms. Lieder made a Hotline Complaint to report that a backhoe was pounding metal sheeting into the ground and causing her home to shake. Pls.' Ex. P-11. Additionally, she reported that there was no vibration monitor on site. *Id.*

4. Plaintiff: Thomas Ryan

Thomas Ryan is seventy-one years old and lives at 1106 Napoleon Ave. with his wife, Judith Jurisich, who co-owns the property. Prior to SELA, Mr. Ryan said his home was in "good" condition. He admitted there were minor cracks in the home but no major work needed to be done. He recalled there being small cracks within certain piers. Mr. Ryan stated his property did not suffer Hurricane Katrina related damage but he did replace the shingles after the storm. He renovated the kitchen right before SELA construction began. He further testified he performed shoring work under the kitchen and both bathrooms. He admitted that no foundation

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 8 of 34

reinforcement was done as part of a renovation but he did clarify that he had the foundation checked and the piers repointed. Mr. Ryan stated construction began in June of 2014.

Mr. Ryan complained that he witnessed backhoes tear up the street and break up concrete and both activities caused his home to shake, shift, and jump. He said that his porch started pulling away from his home. He testified that on a normal day, construction crews worked from 6:00 A.M. or 7:00 A.M. until 3:00 P.M.

In December of 2014, Mr. Ryan placed multiple calls to the Hotline and complained that cracks began appearing inside his home, activities caused his home to shake violently, and he did not see a vibration monitor on site. Pls.' Ex. P-6, P-7, and P-8.

Mr. Ryan testified that construction related vibrations from the construction caused stucco on brick piers to fall off and caused cracks in the bricks to open up. Each room in his home, Mr. Ryan declared, incurred some type of damage and the cracks and damages worsened over time.

He complained of a tremendous amount of dust and noise and stated that his porch was unusable for the duration of construction. Mr. Ryan and his wife had to park on side streets and could not park in front of their property. Construction workers, Mr. Ryan stated, exacerbated the problem by taking up parking spots with their construction trucks. Mr. Ryan recalled that construction ended around Mardi Gras in 2017.

### 5.    Plaintiff: Dorothy White

Dorothy White is eighty-five years old and lives at the property located at 8831-8833 South Claiborne Ave. (hereafter referred to as "8833 S. Claiborne Ave."), which she owned with her husband Donald White, who sadly passed away last December.

She and Mr. White purchased the home in 1969. She testified her husband did a good bit of renovation after moving in. Her property suffered damage from Hurricane Katrina. After the storm her husband tore out the walls and put up sheetrock.

As to physical damage, Ms. White stated that the construction caused cracks to appear in the floor, cracks in the wall and down the window sill. Additionally, she said her hardwood floors "opened up." Ms. White claimed she could not rest during the day and could not rest at night. She too complained about the noise. She would hear piles being driven down into the

ground and the pounding down of "tin" sheets. She stated the machines would shake her out of bed and she felt her whole home shift. She complained about the amount of dust, explaining she had to clean her property constantly.

Ms. White testified the SELA Project was right in front of her home. She further testified that access to her home was blocked off and she had to park blocks away from her property and walk with grocery bags. Ms. White testified the construction ended in 2017.

6.   Brenda Lackings

Brenda Lackings is not a plaintiff in this case; however, she testified to the condition of Ms. White's neighborhood during construction. Ms. Lackings lives at 8817 South Claiborne Ave. and operates a daycare business nearby. She is friends with Ms. White.

Ms. Lackings testified that before SELA the neighborhood was wonderful and peaceful. She testified that SELA construction began in 2011, which is the time she noticed workers bringing in equipment and materials. Ms. Lackings captured two videos that were presented during trial. The videos showed large construction machines operating outside of the White property and noises and disturbances during a "typical day" of construction.

She complained of noise in addition to dust and dirt. At times, Ms. Lackings stated she could barely see from one end of the street to the other due to the dust. She witnessed vibration monitoring but at one time she had to wake a worker up who had fallen asleep while he was supposed to be monitoring. When asked about the overall effect of construction on the neighborhood she testified that it was "horrific" and she felt like she and her neighbors were "sacrificial lambs."

7.   Donald White

Donald White did not testify at trial but his deposition transcript from November 3, 2017, was admitted into evidence. Mr. White indicated, as to shoring, that around the time that he bought the property, in 1969, he performed work on the foundation, but only on one side of the home. Additionally, Mr. White did subsequent foundation work ten to twelve years ago. Mr. White reported that his home suffered roof damage, flooding, and mildew damage from Hurricane Katrina. He completely renovated the home after Katrina by putting in sheetrock walls, a new roof, and eventually new windows.

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A                          Page 10 of 34

Mr. White recalled during construction that he saw pile driving and "big iron track Caterpillars" that appeared to run "a hundred miles an hour." He stated he could not park at his property and had to park around the corner and on the sidewalk. Mr. White attested the construction caused numerous problems. He reported plumbing issues, cracks in the walls, and unlevel windows. When asked about pre-existing cracks, Mr. White stated, "We had a few minor cracks. Now we have a bunch of major cracks."

When asked why he believed such damages were caused by the construction projects, Mr. White responded, "Because there was no damage before the construction projects, and all that vibration, that's my reason for believing it and knowing that it was caused by the construction."

### C.   Expert Testimony – General Findings on Causation

####    1.   Plaintiffs' Expert: Dr. Rune Storesund

Plaintiffs called Dr. Storesund to testify on whether the SELA construction activities caused plaintiffs' alleged damages. Dr. Storesund is a licensed civil engineer in multiple states including Louisiana, California, Hawaii, and Washington. He has seventeen years of experience as a civil engineer. He is also a licensed geotechnical engineer in California with twelve years of forensic engineer experience in the areas of geotechnical, water resource, and environmental engineering. He has a Doctorate of Engineering in Civil Systems and a Masters in Geotechnical Engineering from the University of California, Berkeley. Dr. Storesund was admitted as an expert in forensic geotechnical engineering.

Dr. Storesund testified to two opinions that applied to all five properties. First, he found that the SELA construction activities were a "substantial factor of harm" to all subject properties. He relied on pre-construction and post-construction photos, Hotline Complaints, contractual agreements pertaining to the SELA Project, vibration monitoring reports, maps, project specs, and other pieces of data. Dr. Storesund testified that the .25 PPV threshold was exceeded on several occasions during all project phases. The SELA construction, he concluded, was the "but for" cause of physical damage to the subject properties.

2.     Plaintiffs' Expert: Frederick Gurtler

Frederick Gurtler ("F. Gurtler") is a licensed civil engineer and a licensed home inspector specializing in residential properties. He and his brother, Michael Gurtler, operate Gurtler Bros. Consulting, Inc. ("Gurtler Bros."), a licensed Louisiana engineering company. F. Gurtler claimed to have inspected five to seven thousand properties in the Uptown area. He was admitted as an expert in civil engineering, field structural integrity, vibration analysis, and distress in residential structures.

Similar to Dr. Storesund, Mr. Gurtler opined that all five homes exhibited ground vibration distress. Mr. Gurtler was struck by the "widespread cracking" common to all five properties. He compared the subject properties to thousands of properties he has inspected in different area codes throughout New Orleans. While discussing ground vibrations, F. Gurtler opined that 0.12 PPV, not 0.25 PPV, would be the appropriate threshold for the subject properties because they are historic. F. Gurtler found that considering the "commonality" of damages not present in homes not along the SELA Project, the SELA construction was a "substantial cause" of the damage to the properties and the "but for" cause of the damage.

3.     Plaintiffs' Expert: Michael Gurtler

Michael Gurtler ("M. Gurtler") of Gurtler Bros. is a licensed general contractor. He has testified in two dozen or more cases and in hundreds of depositions on issues including engineering, construction management, moisture management, and wind versus flood damage. M. Gurtler was admitted as an expert in home building and general contractor inspection.

M. Gurtler visited the subject properties multiple times and took over a thousand photographs for his engagement. M. Gurtler did not rely on vibration monitoring, but said it was possible that every exceedance over .25 PPV could cause damage. When comparing the subject properties to the "body of evidence" – thousands of homes without comparable damages – M. Gurtler opined that SELA was the cause of the alleged damages. M. Gurtler noted that the properties in the present action differ from the other properties he has inspected because they show "block after block after block" of similar damage.

4.   Defendant's Expert: Dr. David W. Sykora

SWB called Dr. David Sykora to opine on whether the SELA Project caused the alleged property damages. Dr. Sykora is a licensed professional engineer in Louisiana. He earned his Masters in Geotechnical Engineering and his Doctorate in Civil Engineering from the University of Texas. Dr. Sykora works for Exponent, an engineering and scientific consulting firm that specializes in analyzing accidents and failures. The Court accepted Dr. Sykora as an expert in geotechnical engineering.

Dr. Sykora testified that all of the properties have significant age to them. He declared that no ultrahazardous activity – blasting or pile driving – occurred at Jefferson II or Napoleon III, but testified that pile driving occurred at Claiborne I. Dr. Sykora concluded there was no structural or foundational damage to any of the properties. Moreover, he found that there was no architectural or cosmetic damage to the Deussing, Epstein, and Lieder properties. He did, however, find that the Ryan and White properties suffered some cosmetic damage on account of the SELA Project. In explaining his findings, Dr. Sykora stated he considered the age of the homes (one hundred years or more), the conditions the homes experienced over their lifespan, the "soft clay" soils on which the homes rest, and the fact that each beam and pier of the foundation performs differently.

5.   Defendant's Expert: Dr. James R. Bailey

Dr. James Bailey is a licensed professional engineer who has been practicing for thirty-six years. Like Dr. Sykora, he works for Exponent. Dr. Bailey received his Masters in Civil Engineering and his Doctorate in Civil Engineering from Texas Tech University. His primary area of expertise is with structures, failures, and property damage related claims. Dr. Bailey was admitted as an expert in structural engineering.

Dr. Bailey explained that structural engineering is a field where science and physics are applied to understand load carrying ability. Dr. Bailey testified that renovations can have an impact on loads within a building. He stated that wood frame structures, like the homes at issue, are inherently flexible. When evaluating the properties, Dr. Bailey stated Exponent looked at the homes inside and out to determine the causes of stress, performed laser levels, and floor surveys.

He did not agree that commonalities existed between the homes noting that each property was unique in terms of design, soil, age, and experience with different loads.

Dr. Bailey concluded that the foundations of all five properties were sound. He opined there was no SELA related damage done to the Deussing, Epstein, and Lieder homes. He concluded there was "exacerbation" to the White and Ryan properties as a result of the SELA Project construction activities.

### D.    The SELA Project Phases and Property Specific Evidence

#### 1.    Deussing - 5626 Prytania St.

The Deussing property was affected by Jefferson Phase II (SELA (22)). The selected contractor was Cajun Constructors. Pls.' Ex. P-28. The general construction activities that took place on Jefferson Phase II consisted of jet grouting,[3] excavation for the drainage culvert (installation of bracing and removal of soil with dump trucks), and culvert backfilling (rebar installation and pouring of concrete). *Id.* Water mains were relocated, catch basins and drain lines were installed, sewer mains replaced, and roadways had to be torn up and restored. Fogarty Dep. 1142-1143, Aug. 15, 2016. Dr. Storesund found the purported ZOI could not be validated due to a lack of data, but based on the depth of jet grout columns, the Deussing property fell within the ZOI. Pls.' Ex. P-28. Moreover, he found that based on the vibration monitoring reports for SELA 22, vibration levels exceeded the .25 PPV threshold on 44% of the days of construction. *Id.*

There are no pre-construction photographs or videos available for the Deussing property. M. Gurtler testified that the wood flooring developed separations, a gap developed in the walkway, and a slope developed in the home, among other damages. F. Gurtler testified the Deussing property, being one of the properties with a chimney, showed signs of vibration distress at the fireplace in the form of a vertical crack. Contrastingly, Dr. Bailey explained that

---

[3] Jet grouting essentially replaces the requirement of driving timber piles to support the foundation for a box culvert. Fogarty Dep. 719, Aug. 12, 2016. The jet grout operation involves a soil mixing type operation with a cement slurry that blends with the soils in the ground below the box culvert foundation. *Id.* The jet grout subcontractor augers a hole into the ground, blends a slurry of cement and soil together, makes a circular column, and starting at the invert depth of that column, works up towards the bottom of the box culvert. *Id.* Once a column is filled, the subcontractor moves over and continues the operation for one-hundred percent coverage underneath the box culvert foundation. *Id.* at 719-720.

since chimneys carry highly concentrated loads, cracks at fireplaces are common and not necessarily tied to the SELA Project. Dr. Bailey found that by adding walls, closets, and doorways during the renovation, these renovations affected the loads on the foundation. Dr. Sykora testified that he would have expected the stucco, a brittle material, in the foundation, to have cracked if the property suffered construction related damages.

        2.     Epstein - 5617 Prytania St.

The Epstein property was affected by Jefferson Phase II (SELA (22)). As stated above, the general construction activities that took place on Jefferson Phase II consisted of jet grouting, excavation for the drainage culvert, culvert backfilling, water main replacement, and road destruction and restoration. Pls.' Ex. P-28. Dr. Storesund found that the property fell within the ZOI. *Id.* Construction related vibrations from Jefferson Phase II exceeded the .25 PPV threshold numerous times.

Defendants presented pre-construction photographs dated April 2, 2013, and a pre-construction video dated April 22, 2013. The photographs depict a noticeable horizontal crack running across the railing on the front porch as well as a "stair-step" crack in the front porch foundation. Additionally, the photographs show cracks in the mortar (piers) and a vertical crack beneath a window. The video shows cracks in the ceiling, the den walls, and in various rooms of the home.

F. Gurtler and M. Gurtler testified that the SELA Project caused new damages or exacerbated pre-existing damages inside the home, at the foundation, and outside of the home, at the front porch and gate. M. Gurtler opined the SELA Project caused the kitchen cabinets to fall off the wall. Additionally, M. Gurtler noted that at one pier in the foundation, the home was resting on half of a brick. M. Gurtler further testified that cracks within the home were not consistent with normal settlement because they were not at a forty-five degree angle. He found the cracks were attributable to construction activities.

Dr. Sykora testified that cracks in mortar are common. Moreover, Dr. Sykora claimed that damages allegedly occurring further away from the construction site, such as in the back deck, were not related to the SELA Project. Dr. Bailey testified that the video shows cracks along the molding and those cracks were not caused by the construction activities.

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 15 of 34

3.   <u>Lieder - 731 Napoleon Ave.</u>

The Lieder property was affected by Napoleon Phase III (SELA (23a)).  The construction work was performed by Boh Bros. Construction Co., LLC ("Boh Bros.").  The general construction activities that took place on Napoleon Phase III consisted of excavation and installation of a temporary retaining system ("TRS") and jet grout column installation.  Pls.' Ex. P-28.  Dr. Storesund found, however, that the Lieder property was not located next to an excavation area but was adjacent to a "soilcrete" test column area, which would later become a staging and laydown area.  *Id.*  Dr. Storesund further found that due to a lack of documentation, the purported zone of influence could not be validated.  *Id.*

The "pre-construction" photos are dated October 1, 2014.  The photographs show cracking and separation of the steps on the front porch.  The photos also show a crack above decorative plaster on the walls in one of the rooms on the first floor.  The photographs show cracking and separation of the steps on the front porch.  The photos also show a crack above decorative plaster on the walls in one of the rooms on the first floor.  Ms. Lieder testified that by the time these photos were taken, construction had started and heavy damage had already been done.  Dr. Storesund testified that in April of 2014, six months before the alleged pre-construction photos were taken, workers installed jet grout test columns.

Dr. Storesund testified that there were numerous exceedances of the .25 PPV threshold on Napoleon III.  On cross-examination, however, Dr. Storesund admitted no vibrations were recorded directly in front of the Lieder property.  Rather, Dr. Storesund testified the closest vibration readings were collected across Napoleon Ave., about 100 feet away.  Even so, Dr. Storesund opined the disparity of vibration data evidences "underreporting," suggesting there were exceedances that went unaccounted, and there were locations that should have been monitored but were not.

Regarding the front porch, Dr. Bailey testified that a porch is a much heavier load and it was not surprising to see settlement there.  Dr. Sykora opined, after looking at the photos, the construction activity, the level data, and considering the age of the cracks, that the damages were not caused by SELA.

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A                    Page 16 of 34

4.    Ryan/Jurisich - 1106 Napoleon Ave.

The Ryan property was affected by Napoleon Phase III (SELA (23a))  As explained above, the general construction activities that took place on Napoleon Phase III consisted of excavation, installation of the TRS, jet grout column foundation installation, installation of the culvert, replacement of dirt and sod, and road repair. Pls.' Ex. P-28.  Dr. Storesund found that due to a lack of documentation, the purported zone of influence could not be validated.

The "pre-construction" photographs are dated October 21, 2014.  Mr. Ryan testified that the photos were not taken prior to construction because crews started working months earlier, in June of 2014.  F. Gurtler admitted that cracks in sheetrock may be attributable to the age of a home.  Dr. Bailey testified that inside the home, he noted that a crack behind a bookcase, which was reported as damage in 2017, was the same one that existed in 2014.

Dr. Sykora did not find any .25 PPV exceedances at the Ryan property.  Even so, Dr. Sykora agreed that some damage was attributable to the SELA Project.  The Exponent experts testified that near a fireplace, an adjacent wall showed some cracking that was not recorded prior to SELA.  Therefore, Exponent concluded that there was exacerbation to the Ryan property from SELA.

5.    White - 8833 S. Claiborne Ave.

The White property was affected by Claiborne Phase I (SELA (24)).  The selected contractor was Cajun Constructors.  The general construction activities that took place during Claiborne Phase I consisted of the installation of test piles, removal of test piles, installation of foundation piles, sheet pile installation, excavation, backfill and compaction, and sheet pile removal. Pls.' Ex. P-28.  Dr. Storesund found that in 2012, five timber piles were installed immediately across from 8833 S. Claiborne Ave., and workers installed additional piles adjacent to the property between 2012 and 2014. *Id.*  Work crews utilized large cranes ranging in weight from 50-60 tons to drive the piles. *Id.*  Dr. Storesund found that timber piles extended to a typical depth of 71 feet at the subject property and as such, the property fell within the ZOI.

Pre-construction photographs of the White property were taken on January 3, January 5, and January 6, of 2012.  Dr. Sykora commented that the photographs show cracks in the brick and mortar on the front porch foundation, a horizontal crack above a door frame, and vertical

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 17 of 34

cracks in the kitchen, among others damages. Dr. Bailey testified that the condition of the front porch appeared the same in 2017 when compared to the photographs from 2012.

M. Gurtler opined that chimney cracking at the White property was related to and caused by the effects of construction. M. Gurtler discussed "foundation shifting" and observed the "separation of joints." He noted cracking on the walls adjacent to the chimney and within the chimney, wall to ceiling separations, and differential movement of piers. M. Gurtler found that the front porch would need to be scrapped and a new porch built.

When asked about the back addition to the home, which slopes down, Dr. Bailey testified that the workers should have added another pier and the workers simply failed to provide enough support. Dr. Bailey declared that vibrations could not have caused the tilt to the back addition. Dr. Sykora testified that dewatering occurred at the White property. Dr. Sykora believed that the White property experienced shaking and damage from SELA.

## II.    CAUSATION AND CAUSES OF ACTION

### A.    SELA Project Caused Damage to Plaintiffs' Properties or Exacerbated Pre-Existing Damages

It is impossible for this Court to perform a crack-by-crack analysis in order to determine precisely which cracks existed prior to or formed as a consequence of SELA construction. In some instances, such as at the Epstein property, pre-construction photos offer better evidence of pre-existing conditions. In most instances, however, there were either no pre-construction photographs at all or there was a delay between the start of the project and the date when pre-construction photographs were purportedly taken.

The evidence shows that once construction began, all of the subject properties experienced vibrations due to construction activity. This activity included timber pile driving, excavation, sheet pile insertion, soil testing, jet grouting, backfill paving, among other activities. These acts required the use of backhoes, jackhammers, sky-scraping 60-ton cranes, and the constant loading and movement of dump trucks. All of this created constant noise, dust, dirt, blocked access, and what felt like a never-ending nuisance for all of the homeowners. The plaintiffs were misled into thinking the project would take several months when in reality it lasted from two to five years.

The Court finds the fact witnesses to be very credible. All fact witnesses had first-hand knowledge of the condition of their homes before and after construction. They experienced the disturbances first-hand by electing to remain in their homes during the project. All plaintiffs complained that they could feel their homes shake or jump due to vibrations emitted from the construction activities. Though the extent of damage varied property-to-property, the evidence shows a consistency and commonality of damage shared by all. All homes displayed cracks in the molding, separations between walls and ceilings, and, where applicable, gaps adjacent to chimneys and porches. Gurtler Bros. was struck by the "widespread cracking" throughout the homes. Moreover, they pointed out that the commonality of damages was distinct from thousands of properties they inspected in areas away from the SELA Project.

Just as it is impossible for this Court to perform a crack-by-crack analysis, it is impossible for the Court to perform a vibration-by-vibration analysis. The vibration monitoring evidence presented by plaintiffs did not tie a specific activity or spike to a specific damage. The only way to determine what act caused what damage, M. Gurtler explained, would be to monitor each property every day. M. Gurtler noted, however, this would be very difficult.

Dr. Storesund plotted vibration activity for all three phases where exceedances of the .25 PPV threshold occurred. These plots show that the .25 PPV threshold was exceeded numerous times on an almost daily basis. Dr. Storesund admitted on cross that the data points did not identify the exact location of the occurrences. SWB attempted to show that this data was unreliable. SWB's expert, Dr. Sykora, even opined that he believed analysis of the vibration logs would be a "misapplication of science." Importantly, however, the Court agrees with the plaintiffs' experts that the disparity of vibration data, and lack of monitoring locations, shows "underreporting." Dr. Storesund opined that a number of vibration exceedances occurred that went unreported. This Court agrees. Such underreporting, or rather, absence of reporting, was evident with other pieces of data as well.

SWB hired a forensic contractor, Quick and Associates, and paid it hundreds of thousands of dollars to collect piezometer and inclinometer data for purposes of claims resolution. Interestingly, though, when it became time to resolve claims (this lawsuit), SWB was unable to produce piezometer and inclinometer readings. This information, Dr. Storesund

opined, could have provided the experts with valuable data about the soil conditions before, during, and after the SELA Project. SWB's failure to present this data shows disorganization on behalf of SWB and the Court questions how SWB could have paid so much money for data only to never use it.

SWB's experts, Exponent, admitted that two of the properties incurred SELA related damages. The Court finds some of Exponent's findings to be reliable, namely with regard to the strength and integrity of the foundations. The evidence, however, simply does not support Exponent's conclusions that three of the properties incurred no damage related to SELA.

Dr. Deussing testified that he spent approximately $560,000.00 on a renovation. The property was renovated to excellent condition. Importantly, the renovation was completed just months before the project began. Shortly after construction started, Dr. Deussing testified that cracks began to form in the crown molding and the baseboards began separating. The only significant activity that took place following the renovation was the SELA Project.

The facts show that Mr. Epstein's property experienced vibrations from large scale construction activities at close proximity. Mr. Epstein's front porch rested eighteen feet from the construction site. Prytania St. was completely excavated and a TRS was put in place for the jet grouting operation and installation of the box culvert. Dr. Storesund's vibration logs show that vibrations recorded on Jefferson Phase II exceeded the .25 PPV threshold 44% of the time.

Pre-construction photographs, and a video, show a number of pre-existing damages at the Epstein home. There were, however, a number of damages reported by Mr. Epstein and Gurtler Bros. that were not depicted in the pre-construction footage. For example, M. Gurtler and Mr. Epstein testified that the SELA Project construction activities caused Mr. Epstein's cabinets to fall from the wall. Given the recency of Mr. Epstein's kitchen renovation, the Court finds the kitchen cabinets would not have fallen off the wall but for the SELA Project and related vibrations.

Both Ms. Lieder and Mr. Ryan objected to the assertion that someone took pre-construction photographs at their homes. SWB argues it is unreasonable for the homeowners to claim that damages to their homes occurred in the months prior to when the photographs were taken because no major construction activity had taken place yet. As previously stated, the Court

finds the testimony of Ms. Lieder and Mr. Ryan credible. The evidence shows that both properties experienced vibrations, dust, and noise from construction related activity. Even though Ms. Lieder's property was not adjacent to an excavation site, the Court finds that the staging, soil testing, and movement of heavy equipment outside of her property emitted vibrations that caused damage to her home.

Mr. Ryan's property was adjacent to an excavation site where the road was broken up and pieces of concrete were hauled off in dump trucks. Workers operated large multi-ton cranes for installation of the TRS system and the jet grouting. The Court finds that these activities emitted vibrations that exacerbated pre-existing or created new damages at the Ryan property. SWB's experts acknowledged one instance of SELA related damages at the Ryan property, but the Court finds that SELA caused more damages than those reported by SWB's experts.

The White property experienced the most vibration producing activity for the longest period of time. The evidence shows that construction activities began in 2011 and concluded in 2016. The White property was adjacent to where timber pile driving occurred, an activity that is ultrhazardous and known to emit vibrations that can cause physical damage. The Court finds that there were pre-construction photographs for the White home, but these photographs do not show all of the asserted damages. The Court finds that SELA was not the cause of the slope in the back addition of the home. The experts agreed that this addition was not properly supported by the installers. The evidence does show, however, cracked walls and separations in all rooms of the home, within the exterior, and within the front porch. The Court finds that some of these cracks were pre-existing, but based on the evidence presented by Gurtler Bros. and Dr. Storesund, the construction activities, which were ultrahazardous and lasted up to five years long, caused physical damage to the White home.

For these reasons, and pursuant to the findings of fact and evidence stated above, the Court finds that the SELA Project caused new or exacerbated pre-existing damage at all of the subject properties. As it relates to the foundations of the homes, however, the Court finds the evidence supports the opinions of SWB's experts that the foundations of the homes were structurally sound and as such, do not need repair or reinforcement.

### B.   Plaintiffs' Causes of Action

### 1.   Control and Ownership of the SELA Project

SWB has consistently argued that it is not the owner of the SELA Project. The USACE, SWB argues, is the administrator of the SELA projects and assumes full and complete control the SELA Project in this case. SWB claims it did not perform any construction activities and did not select the contractors, subcontractors, or equipment for the work. Thus, SWB maintains it did not have the care, custody or control of the SELA Project.

SWB made identical arguments in the *Holzenthal* case. There, the Fourth Circuit addressed SWB's position: "underlying all of SWB's arguments with respect to liability is its repeated assertion . . . that the [SELA Project] is not SWB's project because the construction was directly supervised by entities other than SWB. It asserts it was merely a "local sponsor" of the project and that it contracted away to third parties any responsibility it otherwise would have had for damages." *Holzenthal*, 950 So.2d at 61. The *Holzenthal* Court agreed with the trial court's ruling and rejected SWB's argument finding SWB could not and did not contract away the duties it owed the plaintiffs. *Id.*

In so finding, the appellate court reviewed a cooperation-agreement between [the Army Corps of Engineers] and SWB noting: (1) the project was connected to SWB's infrastructure and existed as SWB's property on SWB servitudes and easements; (2) SWB had the final right of approval over the contractors' activities; (3) a project coordination team was made up of representatives from the government and SWB to oversee the project; (4) SWB's requirement to contribute 25% to 50% of the total project costs; and (5) SWB was required to hold and save USACE free from project damages, among others reasons. *Id.* at 67-68.

All of these same facts exist in the present matter. The SELA Project is owned and maintained by SWB. Spooner Dep. 22. SWB was in charge of the engineering and design of the project. *Id.* at 51. SWB was always involved with the design consultants. *Id.* at 61. SWB owns the lands, rights of way, and easements, and SWB provides USACE access to them. *Id.* at 88. The Project Coordination Team consisted of SWB and USACE representatives. *Id.* at 78-79. Pursuant to the PPA and CEA, SWB must cover 35% of the cost of the SELA Project. Joint

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A                                Page 22 of 34

Exhibits J-1 and J-2.  Pursuant to those agreements, SWB must hold harmless and indemnify USACE from damages related to the design, construction, and maintenance of the project.  *Id.*

Accordingly, if there were any doubt, this Court finds that SWB is the owner and controller of the SELA Project and SWB should be considered as such under plaintiffs' theories of recovery.

2. <u>Inverse Condemnation</u>

Louisiana Constitution Article I, Section 4, provides, "Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit." La. Const., Art. I, Section 4. The Constitution requires compensation even in those cases in which the State has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose. *Holzenthal*, 950 So.2d 55, 62, *citing State, Through Dept. of Trans. and Dev. v. Chambers Investment Company, Inc.*, 592 So.2d 598, 602 (La. 1992).  As the Louisiana Supreme Court noted in *Chambers*, it is now hornbook law that any substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of federal and state constitutions. *Id.* at 62-63.  The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. *Chambers*, 592 So.2d 598, 602 *citing Reymond v. State, Dept. of Highways*, 255 La. 425, 231 So.2d 375, 383 (1970).  The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. *Id.* [Citations omitted].

The Louisiana Supreme Court developed a three-part test to determine whether a claimant is entitled to eminent domain compensation: (1) whether a person's legal right with respect to a thing or object has been affected; (2) if a property right is involved, whether the property has been taken or damaged in a constitutional sense; and (3) whether the taking or damage is for a public purpose. *See Holzenthal*, 950 So.2d at 63.

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A
              Page 23 of 34

In *Holzenthal*, the trial court applied this test and found SWB committed inverse condemnation. *Id.* The *Holzenthal* court declared, "[t]his is clearly a case in which a valid and vital public purpose, improved drainage of our city-below-sea-level was served . . . [d]espite the best efforts of the SWB and [Army Corps of Engineers] and the contractors, dewatering and vibration damage to these neighboring interests was the natural consequence of the Project." *Id.* at 85. For reasons similar to those articulated in *Holzenthal*, applying the *Chambers* test, this Court finds that plaintiffs suffered an inverse condemnation of their property. First, plaintiffs have a legal right in their properties because they are owners. Moreover, their testimony, as well as the expert testimony, shows that property rights were adversely affected by construction activities. Second, plaintiffs' damages were an integral consequence of the SELA Project, which was specifically carried out to improve the drainage system and to reduce flood-related damage in the New Orleans area. Last, the Court finds that providing drainage improvement to the neighborhoods of New Orleans certainly serves a public purpose. As such, the Court finds SWB committed inverse condemnation.

### 3.   Strict Liability for Ultrahazardous Pile Driving Under Article 667

Pursuant to La. C.C. art. 667, "the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives." La. C.C. art. 667.

In *Vicknair v. Boh Bros. Construction Co.*, the Fifth Circuit found that the installation of steel sheeting with a vibratory hammer, and the driving wood sheeting with a backhoe (for an emergency sewer repair) was not ultrahazardous. 2003-1351 (La. App. 5th Cir. 3/30/04); 871 So.2d 514. In *Suire v. Lafayette City-Parish Consol. Gov't.*, the Louisiana Supreme Court cited *Vicknair* approvingly and found that the driving of metal sheets with backhoes did not constitute pile driving under article 667. 2004-1459 (La. 4/12/05), 907 So.2d 37. In *Holzenthal*, the Fourth Circuit distinguished *Suire* and found that driving of metal sheets into the ground with a crane and vibratory pile-driving hammer, opposed to a backhoe, constituted "pile driving." 950 So.2d 55. The court relied on vibration monitoring evidence, which showed that the highest levels of vibrations would have been caused by crane movement regardless of the type of pile driving. *Id.*

In the instant case, there is no dispute that timber pile driving occurred adjacent to the White property as part of Claiborne Phase I. The Court finds that ultrahazardous pile driving occurred at the White property and that such activity caused damage. Additionally, regarding the Lieder property, Ms. Lieder's property was not adjacent to an excavation area rather it was across from a staging area. Pls.' Ex. P-28. Thus, unlike the other properties, there were no sheet or timber piles inserted by Ms. Lieder's property.

At the Deussing, Epstein, and Ryan properties, no timber pile driving occurred and no sheets were installed with a vibratory hammer. Fogarty Dep. 844, Aug. 12, 2016. Contractors installed metal sheet piles into the ground as part of the TRS. In contrast to *Holzenthal*, the metal sheet piles were not installed with a crane and vibratory hammer, they were installed with a crane and a piece of equipment known as a Giken Silent Piler ("Giken"). Fogarty Dep. 842, Aug. 12, 2016. According to Mr. Fogarty, "the steel sheet pile for the retaining structure system is installed with the press-in machine only [Giken]." *Id.* at 722. Similarly, as explained by Dr. Sykora, the sheet piles are "pressed" into the ground, not driven.

The Court finds that the definition of ultrahazardous activity should not be expanded under these facts. The Louisiana Supreme Court in *Suire* explained, "In light of the 1996 amendment, Louisiana courts are relieved of the responsibility to decide whether a certain activity is ultrahazardous for purposes of deciding whether the absolute liability standard applies. *Suire*, 907 So.2d 37, 48-49, *citing Mossy Motors, Inc. v. Sewerage and Water Bd. of City of New Orleans*, 1998–0495 (La. App. 4th Cir. 5/12/99); 753 So.2d 269 (discussing the 1996 amendment and noting that "[t]he new definition by amendment defines an ultrahazardous activity legislatively"). "Any other activities besides the two the article specifically lists are not ultrahazardous for purposes of article 667. Thus, to qualify for the absolute liability standard, the plaintiff must show that the activity complained of is either 'pile driving' or 'blasting with explosives.'" *Suire*, 907 So.2d at 49. Following the Louisiana Supreme Court's analysis in *Suire*, this Court does not find that the installation of metal sheet piles into the ground with a Giken constitutes the ultrahazardous activity of pile driving. Even though the contractors utilized a crane with the Giken, the evidence shows that a Giken is a piece of equipment that emits less vibrations than other types of equipment traditionally used for driving timber or sheet

piles. Thus, SWB is not strictly liable for an ultrahazardous activity at the Deussing, Epstein, Ryan, or Lieder property.

4.   Strict Liability and Negligence Under articles La. C.C. arts. 2315, 2317 and 2317.1

Plaintiffs' strict liability claims arise pursuant to La. C.C. arts. 2317, and 2317.1. Article 2317 reads, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." La. C.C. art. 2317. Those modifications are contained in article 2317.1:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

La. C.C. art. 2317.1.

As a threshold matter, to prevail under articles 2317 and 2317.1, a plaintiff must establish custody or *garde*. The owner of a thing is the presumed guardian of its structure. *Doughty v. Insured Lloyds Ins. Co.*, 576 So.2d 461, 464 (La. 1991). The test for determining custody or *garde* is twofold: (1) whether the entity has control or authority over the thing; and (2) whether the person receives a substantial benefit. *Id.* Here, SWB has control and authority over the SELA Project because SWB is responsible for the city's public drainage system and it contracted with the USACE to engineer and execute the project. *See supra* Section I.A.2; Section II.B.1. SWB derives a benefit because the SELA Project's purpose is to improve the public drainage system, for which SWB is responsible.

With custody and *garde* established, a plaintiff must also prove: (1) the project presented an unreasonable risk of harm; (2) the owner could have prevented the harm had it exercised reasonable care; and (3) the owner's failure to exercise such care caused the plaintiffs' damages. La. C.C. arts. 2317 and 2317.1

First, SWB was well aware the project presented a risk of harm to plaintiffs' properties pursuant to the terms of the PA and its understanding from USACE that properties could

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 26 of 34

experience vibration related damages, especially those properties located within the ZOI and APE. Second, SWB had notice that construction was adversely impacting the properties. The evidence shows that SWB received vibration data, showing exceedances over .25 PPV, on a regular basis. Additionally, the evidence shows SWB received numerous complaints on the Hotline. Yet, there is no evidence that SWB exercised care to prevent further damage. Last, the evidence shows that the construction activities, which lasted several years, caused physical damage to plaintiffs' homes in the form of cracks and separations and caused disturbances that interfered with plaintiffs' use and enjoyment of their properties. For these reasons, the Court finds that plaintiffs presented sufficient evidence to hold SWB strictly liable under La. C.C. arts. 2317 and 2317.1.

As this Court understands, the essential difference between the strict liability and negligence theories is knowledge of a defect. *See Pool v. City of Shreveport,* 607 So.2d 861, 863–64 (La. App. 2nd Cir. 1992). Knowledge of a defect gives rise to a corresponding duty to act. *See Soccorro v. City of New Orleans,* 579 So.2d 931 (La. 1991). Under article 2317, knowledge of the defect is unnecessary. *Id.*; *see also Loescher v. Parr,* 324 So.2d 441, 446 (La. 1976). Given that this Court found SWB strictly liable under articles 2317 and 2317.1, the Court does not find that a negligence analysis is necessary.

## III.    CONCLUSIONS AND DAMAGES

### A.    Quantum

The Court accepts the testimony of, and finds that the evidence supports, Exponent's opinion that all of the homes' foundations were structurally sound and not damaged by SELA construction activities. Accordingly, the Court is not awarding damages for foundation or shoring repair. Since the homes will not receive new foundations, this Court finds that the homeowners will not incur an expense to have their "contents" moved, stored, and returned to their homes.

Plaintiffs' expert, Dr. Wade Ragas, was admitted as an expert in real estate evaluation, real estate market analysis, comparable sales, externalities, and loss of use of property rights. Dr. Ragas rendered opinions on what he described as "negative externality damages." These damages would compensate plaintiffs for the loss of the use and loss of the enjoyment of their

properties during the construction phases.   Additionally, Dr. Ragas provided estimates on damages that would compensate plaintiffs for having to move into a comparable home for the duration of repairs to their homes.

SWB did not provide its own expert to refute Dr. Ragas' numbers.   Dr. Ragas' calculations, specifically with regard to the duration of phases, contained inaccuracies. Nevertheless, the Court recalculated Dr. Ragas' estimates using timelines derived from the testimony and expert reports.

As it relates to Dr. Ragas' estimates to cover the cost of relocation to a house of comparable rental, the Court does find that plaintiffs are entitled to such damages.  As previously stated, the Court does not find that repairs will require plaintiffs to move out of their homes.  The Court's duty is not to provide plaintiffs with new homes.  Rather, the Court's duty is to make the plaintiffs whole as best it can.  The following damage awards are based on the expert opinions and provide plaintiffs with compensation to make repairs to their homes for conditions created or exacerbated by the SELA Project.

       1.    <u>Deussing - 5617 Prytania St.</u>

M. Gurtler testified that the property damage repair would cost $100,382.25.[4]  The Court finds this number excessive and reduces it according to estimates provided by Gurtler Bros.

<u>Property Damage</u>

| | |
|---|---|
| Estimate: | $100,382.25 |
| Foundation/Shoring Repair: | ($32,292.47) |
| Contents: | ($21,428.83) |
| Total: | $46,660.95 |

Dr. Deussing's testimony regarding the start of construction was unclear.  Mr. Epstein, however, who lives a couple doors down, testified that the construction activities began in February of 2014.  As to the end date, Dr. Storesund's report states the project was "largely completed" in March of 2016.  Dr. Ragas opined that $769.00 per month for forty-six (46) months represents the value of the Deussings' loss of use and loss of enjoyment.  The Court

---

[4] M. Gurtler rendered opinions on the costs of repairs using the insurance-approved software called Xactimate.

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 28 of 34

calculates twenty-five (25) months based on the evidence that the construction work began in February of 2014 and was largely completed in March of 2016.

### Loss of Use and Loss of Enjoyment

|  |  |
|---|---|
| Total (25 months): | $19,225.00 |

### Damages Total

|  |  |
|---|---|
| Property: | $46,660.95 |
| Loss of U/E: | $19,225.00 |
| **Total:** | **$65,885.95** |

2.    Epstein - 5626 Prytania St.

M. Gurtler testified that the property damage repair would cost $124,463.42.  The Court finds this number excessive and reduces according to estimates provided by Gurtler Bros.

### Property Damage

|  |  |
|---|---|
| Estimate: | $124,463.42 |
| Foundation/Shoring Repair: | ($49,220.86) |
| Contents: | ($19,154.51) |
| Total: | $56,088.05 |

Mr. Epstein testified that construction activities began outside of his home in February of 2014.  This date is corroborated by a Hotline Complaint, made on his behalf, dated January 30, 2014.  Pls.' Ex. 30.  As to the end date, Dr. Storesund's report states that the project was largely completed in March of 2016.   Dr. Ragas opined that $955.50 per month for forty-six (46) months represents the value of Mr. Epstein's loss of use and enjoyment.  The Court calculates twenty-five (25) months based on the evidence that the construction work started in February of 2014 and was largely completed in March of 2016.

### Loss Use and Loss of Enjoyment

|  |  |
|---|---|
| Total (25 months): | $23,887.50 |

### Damages Total

|  |  |
|---|---|
| Property: | $56,088.05 |

| | |
|---|---|
| Loss of U/E: | $23,887.50 |
| **Total:** | **$79,975.55** |

3.  <u>Lieder - 731 Napoleon Ave.</u>

M. Gurtler testified that the property damage repair would cost $308,998.63.  The Court finds this number excessive and reduces according to estimates provided by Gurtler Bros.

<u>Property Damage</u>

| | |
|---|---|
| Estimate: | $308,998.63 |
| Foundation/shoring Repair: | ($154,954.57) |
| Contents: | ($27,995.35) |
| Total: | $126,048.71 |

Construction activities outside the Lieder home began in April of 2014 as this was the time, according to Dr. Storesund, that workers installed jet grout test columns.  Ms. Lieder's testimony corroborates this date.  Ms. Lieder testified that the alleged "pre-con" photos, taken in October of 2014, were not actually pre-construction photos because construction began months earlier.  As to the construction end date, Dr. Storesund's report states the project was largely completed in November of 2016.

Dr. Ragas opined that $1,188.00 per month for forty-three (43) months represents the value of Ms. Lieder's loss of use and loss of enjoyment.  The Court calculates that construction lasted thirty-two (32) months based on the evidence that workers installed jet grout test columns in April of 2014 and that construction was completed in November of 2016.

<u>Loss of Use and Loss of Enjoyment</u>

| | |
|---|---|
| Total (32 months): | $38,016.00 |

<u>Damages Total</u>

| | |
|---|---|
| Property: | $126,048.71 |
| Loss of U/E: | $38,016.00 |
| **Total:** | **$164,064.71** |

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 30 of 34

4.   Ryan/Jurisich - 1106 Napoleon Ave.

M. Gurtler testified that the property damage repair would cost $137,902.87. The Court

finds this number excessive and reduces it according to estimates provided by Gurtler Bros.

Note, Gurtler Bros.' estimates did not contain a figure for the contents.

Property Damage

| | |
|---|---|
| Estimate: | $137,902.87 |
| Foundation/Shoring Repair | ($46,808.32) |
| Total: | $91,094.55 |

Mr. Ryan testified that construction activities began outside of his home in June of 2014

and ended around the time of Mardi Gras 2017, which would have been in February of 2017.

Dr. Storesund's report states that Napoleon Phase III was largely completed in November of

2016. Finding Mr. Ryan's testimony credible, the Court uses February of 2017 as the end date

for calculation purposes.

Dr. Ragas estimated that $719.75 per month for forty-one (41) months represents the

value of Mr. Ryan's loss of use and loss of enjoyment. The Court calculates thirty-three (33)

months based on the testimony that the construction work started in June of 2014 and concluded

in February of 2017.

Loss of Use and Loss of Enjoyment

| | |
|---|---|
| Total (33 months): | $23,751.75 |

Damages Total

| | |
|---|---|
| Property: | $91,094.55 |
| Loss of U/E: | $23,751.75 |
| | |
| **Total:** | **$114,846.30** |

5.   White - 8833 S. Claiborne Ave.

M. Gurtler provided two different estimates for the cost of repair to the White home,

explaining that there was a code compliance issue: Ms. White's home is not at base flood

elevation. M. Gurtler testified there is a provision in the building code that states if a home has

incurred damages that amount to 50% of its value and a repair is done to the home, the entire home must be upgraded to the current code. M. Gurtler further testified that if Ms. White's foundation were to be fixed it would need to be elevated to the current base flood elevation. To replace the foundation entirely and make the home code compliant, M. Gurtler estimated a $244,072.72 cost of repair. In the alternative, M. Gurtler estimated a $128,515.82 cost of repair that would repair the foundation but not repair the home to code compliance. This Court uses the second estimate and reduces it according to figures provided by Gurtler Bros.

Property Damage

| | |
|---|---|
| Estimate: | $128,515.82 |
| Foundation/Shoring Repair: | ($47,389.53) |
| Moving: | ($15,399.72) |
| Total: | $65,726.57 |

Brenda Lackings, Ms. White's neighbor testified that construction activity began in the neighborhood in 2011. Dr. Storesund's report corroborates this testimony. His report reads that SELA(24) construction began in October of 2011. Though Ms. White testified that the construction ended in 2017, Dr. Storesund's report shows that all phases of work were completed in May of 2016.

Dr. Ragas estimated that $502.75 per month for fifty-nine (59) months represents the value of Ms. White's loss of use and loss of enjoyment. The Court calculates fifty-six (56) months based on the evidence that the work SELA(24) work began in October of 2011 and concluded in May of 2016.

Loss of Use and Loss of Enjoyment

| | |
|---|---|
| Total (56 months): | $28,154.00 |

Damages Total

| | |
|---|---|
| Property: | $65,726.57 |
| Loss of U/E: | $28,154.00 |
| | |
| **Total:** | **$93,880.57** |

**B.      Just Compensation and Comparative Fault**

    1.      Just Compensation

SWB argues in its post-trial brief that any damages assessed against SWB must be limited to that allowable under the Fifth Amendment to the Unites States Constitution, which precludes recovery of consequential damages, including for loss of use and enjoyment. Moreover, SWB argues that this Court should apply *South Lafourche v. Jarreau*, 16–0788 (La. 3/31/17); 217 So.3d 298, to limit plaintiffs' potential damage awards. This Court finds the facts of this case distinct from *South Lafourche v. Jarreau.* Furthermore, the Court finds SWB's just compensation argument without merit.

    2.      Comparative Fault

SWB argues in its post-trial brief this Court must assess a portion of fault on USACE and other nonparties under Louisiana Civil Code articles 2323 and 2324. Contrastingly, plaintiffs argue that the burden was on SWB to prove that another party was at fault and SWB failed to meet its burden. Plaintiffs contend none of the witnesses testified to an allocation of fault and none of the deposition excerpts identify any of the nonparties at fault. This Court agrees with plaintiffs.

The issue of contractor liability was discussed in *Holzenthal.* 950 So.2d at 68.  As a matter of law, a contractor on a state or federal project who complies with the project's plans and specifications is not liable for damages to the property of third parties. *Holzenthal*, 950 So.2d 55, 80-81, *citing Yearly v. W.A. Ross Construction* Co., U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940); La. R.S. § 9:2771. This Court does not recall hearing testimony that the contractors deviated from the SELA Project specifications. Nevertheless, a party asserting comparative fault bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause in fact of the damage complained of. *Pruitt v. Nale*, 45, 483 (La. App. 2nd Cir. 8/11/2010), 46 So.3d 780, 783; [citations omitted]. This Court finds SWB has failed to carry its burden of proving that another party was at fault.

[SIGNATURE ON THE FOLLOWING PAGE]

**READ AND SIGNED** this 25th day of April, 2018, in New Orleans, Louisiana.

_____
**HONORABLE NAKISHA ERVIN-KNOTT**
**JUDGE, CIVIL DISTRICT COURT**

A TRUE COPY
DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

*Sewell vs. Sewerage & Water Board of New Orleans*
CDC# 2015-4501; Div. "D"; Section: 12
Reasons for Judgment: Residential Trial Group A

Page 34 of 34